# Packer *v.* Noble, et al.

## Appeal of Seth Caldwell, Jr., surviving executor of the will of Joseph Noble.

## Appeal of Samuel B. Young, et al., administrators of the estate of Augustus E. Noble.

## Appeal of James H. Campbell, et al., surviving executors of the will of Barnabas Hammett.

## Appeal of Franklin A. Hall.

## Appeal of Seth Caldwell.

1. In this case, owing to its exceptional features, the Supreme Court elaborately reviewed all the evidence; no serious error being discovered in the findings of fact by the Master, as approved by the court below, the same were affirmed.

2. The Master reported that the costs in the case should be divided between three of the several unsuccessful parties: *Held*, that as they were chiefly responsible for the very protracted litigation, the decree was equitable.

3. A party defendant in a bill praying for a partnership account may be called as a witness for complainant, although one of his co-defendants

[Packer v. Noble.]

is dead, and his executors had been substituted of record at the time said witness was called. Said witness is within the letter of the Act of March 27th 1865. and the fact that he was presumably a friendly witness for the complainant goes to his credit and not to his competency.

4. A witness who would have been competent prior to the Act of April 15th 1869, is not rendered incompetent by said Act.

April 2d to 6th 1883. Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY and CLARK, JJ. STERRETT, J., absent. GREEN, J., did not sit.

APPEALS from the Court of Common Pleas of *Carbon county* : In equity : Of January Term 1883, Nos. 265 to 269.

Bill in equity, filed August 19th 1857, by Asa Packer against Joseph Noble and others, his copartners, for an account and equitable relief. Pending the litigation the plaintiff and several of the defendants died, and their respective executors or administrators were substituted of record. Answers were filed and the cause was referred to examiners, and subsequently to a Master (Samuel Robb, Esq.), whose report was filed November 15th 1879. Exceptions filed in the interests of the several appellants were dismissed by the court; the Master's report was confirmed and a final decree entered October 12th 1882, from which these several appeals were taken.

Before the Master, and after the death of the defendant Joseph Noble and the substitution of his executors, the plaintiff, Asa Packer, was offered as a witness in his own behalf. Objected to, as incompetent, under the terms of the proviso to the Act of 1869, the action being against executors. The objection was at the time overruled and the witness admitted to testify. Subsequently, the Master, upon the authority of more recent decisions, reported that the witness was incompetent, and that his testimony had been ruled out and wholly disregarded by him in his consideration and decision of the case. The Master further reported that he believed that he was uninfluenced by said testimony; that he had endeavored to exclude it entirely from affecting his mind, and he believed he had succeeded in doing so " to the extent to which success in a matter of this sort was possible for him."

Elisha A. Packer, a cousin of the plaintiff, and one of the defendants, was also called and was one of the principal witnesses for the plaintiff. In order to contradict him, and also to testify as to other points in the case, the defendants called two others of co-defendants, Messrs. Hall and Caldwell. On this point the Master reported: " When the competency of a witness depends upon his being an adversary of the party calling him, his position as an adversary is determined, not by the character of the testimony he is expected or intended to deliver, or

does deliver, or by his personal and private relations to the other parties in the cause, but by his position on the record, or by his interest in the result of the controversy. In this railroad issue the interest of this witness coincided with his position on the record, and he stood just as adversarily to the plaintiff as did any of the other defendants; if they succeeded he would succeed, and if they failed he would fail. Now, prior to the Act of 1869, this witness was not only competent, but could be compelled to testify under the Act of 1865, at the call of his adversary, and even prior to the passage of that Act he was competent to testify when so called, if willing to be sworn: Floyd *v.* Bovard, 6 W. & S. 75. It has been held that the Act of 1869 was a remedial statute, and was not intended to disable any one who was competent before its passage: McFerren *v.* Mont Alto Iron Co., 26 P. F. S. 180; Pratt *v.* Patterson, 31 P. F. S. 114. In Sheetz *v.* Hanbest, 31 P. F. S. 100, it was said by SHARSWOOD, J., delivering the opinion, that 'that Act was intended as an enabling statute. No person competent before the passage of the Act was rendered thereafter incompetent, either by the words or the spirit of the law. Regarding the issue below as an action by executors, the statute declares that it shall not apply in such actions; in other words, that the competency or incompetency of witnesses shall remain as if the statute had not been enacted.' As, then, he was competent before the passage of the Act of 1869, he was competent after its passage, unless the decisions in these cases have been qualified by the reasoning of the Court in Menges *v.* Eyster, 35 Leg. Int. 421, and it must now be held that when death has destroyed the equality between the parties none of the survivors are competent for themselves or their adversaries. But if E. A. Packer was not competent to testify for the plaintiff, upon what grounds and for what reason were Mr. Hall and Mr. Caldwell competent to testify against him? The record does not show the grounds upon which the Master's predecessor admitted these two witnesses. If they were admitted under the Act of 1869, it was error, as the later readings of that Act would seem to show, as the executors of Mr. Noble had then been substituted, and they were both parties to the record and interested in the issue. Mr. Caldwell was doubly a party, and doubly interested, in his own right and as one of these very executors. It is true that he had sold out his interest in the partnership assets before he was called to testify, but the sale was not made until after suit was brought, and did not relieve or release him from costs, and while the Act of March 27th 1865, directs that the right to claim commissions or compensation shall not be taken as such an interest as shall disqualify an executor as a witness, the proviso directs that the

[Packer v. Noble.]

Act shall not apply, inter alia, ' to any case now pending in any court in this Commonwealth,' and this case was then pending, and had been pending since 1857. If he did not admit them under the Act of 1869, he may have admitted Mr Caldwell under the Act of 1865 to testify generally because the plaintiff had first called him to testify specially : Bennett v. Williams, 7 P. F. S. 404, or he may have admitted both of these witnesses because E. A. Packer had been admitted as a witness, and they were thus made competent under the Act of April 10th 1867, which declares that where one of co-plaintiffs and co-defendants has been compelled by his adversary to testify, the other co-plaintiffs or co-defendants of the party so compelled to testify ' shall also be allowed to give evidence,' that is, they were held to be competent as witnesses because they were the adversaries of the plaintiff—co-adversaries with E. A. Packer.

" As the present Master understands the law they were properly admitted if E. A. Packer was properly admitted, and not otherwise ; and if his testimony must be excluded, their testimony cannot be considered. Whether or not, under the reasoning of Menges' Adm'r v. Eyster, an error was committed in admitting all of these co-defendants to testify must be determined by the court. The Master is of opinion that they were properly admitted, and that, therefore, their testimony is properly before him."

Numerous exceptions to the Master's report were filed on behalf of the plaintiff and several of the respective defendants, all which were overruled by the court (DREHER, P. J.), and the following final decree was entered :

And now, to wit, January 9th A. D. 1883, this cause came on to be heard in the month of September 1881, upon the Master's report and exceptions thereto, and was argued by counsel, and thereupon, upon consideration thereof, it is ordered, adjudged, and decreed, that all the exceptions be dismissed and the report confirmed ; and it is further ordered, adjudged, and decreed, that the estate of Barnabas Hammett, deceased, is indebted to the estate of Asa Packer, deceased, as of May 1st 1879, in the sum of $22,117.64, and that the defendants, the executors of the said Barnabas Hammett, deceased, do, out of the assets thereof, pay the said sum of $22,117.64, with interest, from the first day of May 1879, to the plaintiffs, the executors of the said estate of Asa Packer, deceased ; and further, that the said estate of Barnabas Hammett, deceased, is indebted to the estate of Joseph Noble, deceased, in the sum of $29,898.74, and that the defendants, the executors of the said estate of Barnabas Hammett, deceased, do, out of the assets thereof, pay the said sum of $29,898.74, to the defendants, the executors of the said

[Packer *v.* Noble.]

estate of Joseph Noble, deceased; and further, that the said estate of Barnabas Hammett, deceased, is indebted to the estate of Augustus E. Noble, deceased, in the sum of $7,339.05, and that the defendants, the executors of the said estate of Barnabas Hammett, deceased, do, out of the asssets thereof, pay the said sum of $7,339.05, to the defendants, the administrators of the said estate of Augustus E. Noble, deceased; and it is further ordered, adjudged, and decreed, that the defendant, Franklin A. Hall, is indebted to the estate of Asa Packer, deceased, as of May 1st 1879 in the sum of $6,250.11, and that the said defendant, Franklin A. Hall, do pay the said sum of $6,250.11; with interest from the said first day of May 1879, to the plaintiffs, the executors of the said estate of Asa Packer, deceased; and further, that the said defendant, Franklin A. Hall, is indebted to the estate of Joseph Noble, deceased, as of May 1st 1879, in the sum of $8,448.92, and that the said defendant, Franklin A. Hall, do pay the said sum of $8,448.92, to the defendants, the executors of the said estate of Joseph Noble, deceased; and further, that the said defendant, Franklin A. Hall, is indebted to the estate of Augustus E. Noble, deceased, in the sum of $2,073.90, and that the said defendant, Franklin A. Hall, do pay the said sum of $2,073.90, to the defendants, the administrators of the said estate of Augustus E. Noble, deceased; and it is further ordered, adjudged, and decreed, that the defendant Elisha A. Packer, is indebted to the estate of Asa Packer, deceased, as of May 1st 1879, in the sum of $3,891.33, and that the said defendant, Elisha A. Packer, do pay the said sum of $3,891.33, with interest from the said first day of May 1879, to the plaintiffs, the executors of the said estate of Asa Packer, deceased; and further, that the said defendant, Elisha A. Packer, is indebted to the estate of Joseph Noble, deceased, in the sum of $5,260.34, and that the said defendant, Elisha A. Packer, do pay the said sum of $5,260.34, with interest from the said first day of May, 1879, to the defendants, the executors of the said estate of Joseph Noble, deceased; and further, that the said Elisha A. Packer, defendant, is indebted to the estate of Augustus E. Noble, deceased, in the sum of $1,291.23; and that the said defendant, Elisha A. Packer, do pay the said sum of $1,291.23, to the defendants, the administrators of the said estate of Augustus E. Noble, deceased; and it is further ordered, adjudged, and decreed, that the Master's fee for his services in this cause since the last payment to him be and is hereby fixed at the sum of $5,000, to be treated and paid as part of the costs in the cause, and that the costs in the cause be paid equally by the executors of the said estates of Asa Packer, Joseph Noble, and Barnabas Hammett respectively.

[Packer *v.* Noble.]

From this decree the several appellants above named took these appeals.

The facts of the case and the material assignments of error, are fully set forth in the opinion of this court.

*James H. Campbell* and *William A. Porter,* for executors of Barnabas Hammett, appellants.

*Henry W. Muzzey,* for the other appellants.

*Furman Sheppard* and *George W. Biddle* (*George Biddle,* with them), for the appellees.

Mr. Justice PAXSON delivered the opinion of the court, October 18th 1883.

It is now over twenty-six years since this proceeding was commenced in the court below. During that time the three principal parties and several of the eminent counsel concerned in the cause have been removed by death. The paper-books, Master's report, the arguments before the Master, the testimony and exhibits, occupy twelve printed volumes. It was stated in the argument at bar that the expenses of the litigation when it reached this court had amounted to over one million dollars. It involves many millions more. I mention these circumstances merely by way of apology for consuming nearly the whole of my summer vacation with the examination and study of the case. The labor of such examination was greatly increased, for the reason that all of the important assignments of error were to the findings of the Master upon questions of fact. Under such circumstances we might well have rested upon the findings of the Master, sustained by the court below, unless clear error had been pointed out. Such is the usual course in equity, and this case abundantly vindicates the necessity of this rule as well as its wisdom. We have departed from it in this instance, and cheerfully performed the enormous labor it required for several reasons. The great interests involved, and the serious consequences to the parties resulting from our decision are of themselves sufficiently grave. Then the alleged errors in the findings of the Master were pressed with so much zeal and vehemence, if I may use the expression, by the eminent counsel, representing the appellants, that more than ordinary care seemed necessary in order to enable us to assure ourselves that no injustice had been done by the decree below. And other circumstances may be mentioned. Asa Packer, the plaintiff, was examined on his own behalf against the objection and protest of the appellants. No question arises now as to the admissibility of his testimony, as the learned Master at a subsequent stage of the proceedings excluded it from his consideration, and

says in his report that he was not consciously influenced by it. The appellants, however, complain bitterly of this. They say in substance, that while they have no doubt the Master honestly endeavored to divest his mind of any impressions produced by Judge Packer's testimony, yet that he was so saturated with it as to make the effort unavailing, and point as proof thereof to several findings of fact which it was alleged the Master could only have found upon the excluded testimony. Much stress was also laid upon the fact that the plaintiff was a man of large wealth, and occupied a position of commanding influence in the community, and that these facts, in conjunction with his agreeable social qualities, may have deepened the impressions created by his testimony in such a manner as to have insensibly affected the judgment of the Master. That the latter would knowingly have suffered himself to be affected by any such influences is not asserted by any one. That he at least endeavored to exclude them from his mind is apparent from the following extract from his report :—

" He is unconscious that this testimony, as is asserted by the exceptants, materially influenced him by permeating his mind, and by affecting the conclusions and results of fact that he has reported, or that the defendants' case was prejudiced and clouded by its admission. He is not sure that he clearly understands what the exceptants mean by 'the necessary effect' of this testimony; but he is not conscious that the exclusion of it did not remove every material 'effect of the same' from his mind 'in arriving at his conclusions.' He does not pretend that it is wholly impossible that his mind could have been influenced by his general recollection of the substance of this testimony, but simply that he was unconscious that it was so influenced. He did not consider it or study it, or even read it over, as he read and read again, in whole or in part, and considered and studied the testimony of the other witnesses and the written proofs. He endeavored, as best he could, to exclude it entirely from his consideration, except as hereinafter stated, and thought and thinks that he succeeded in doing so to the extent to which success in a matter of this sort was possible for him."

The possibility that the impressions produced by Judge Packer's testimony may have, to some extent, unconsciously affected his conclusions, is here frankly admitted by the Master. This admission does great credit to his candor and sense of right, and adds strength to his assertion, that to the best of his ability he excluded the testimony from his consideration. In view, however, of the possibility of his having been mistaken, and of the serious results to the appellants which such a mistake might involve, I saw no way to meet this difficulty but to read and study the evidence with the same care that a new Master would,

in case the cause had been referred to him, for the purpose of refinding the facts. This I have done. I have read and studied the testimony, wholly omitting that of Asa Packer, with a result that will appear later in this opinion.

Before I proceed to discuss the facts I will dispose of the little law there is in the case. This can be done in a few words. The sixth assignment alleges that "the learned court erred in refusing to reject the testimony of Elisha A. Packer, he being an incompetent witness."

This was a partnership bill praying for an account, and Elisha A. Packer the witness was one of the defendants. He was called by the plaintiff. The ground of the objection was, that Joseph Noble, one of the defendants, was deceased, and his executors substituted upon the record at the time the witness was offered.

If there were any force in this objection to Elisha A. Packer's competency, it is very much weakened by the fact that the appellants afterwards called Mr. Hall and Mr. Caldwell, two of the defendants, to testify against him. These two witnesses were evidently called under the Act of 10th April 1867, P. L. 60, which enacts that "in all civil actions now pending, or hereafter to be brought, where there are more than one plaintiff or defendant, and either party shall compel one of the adverse parties to testify under the Act to which this is a supplement (Act of March 27th 1865, P. L. 38), the co-plaintiff or plaintiffs, or co defendant or co-defendants, of the parties so compelled to testify, shall also be allowed to give evidence." The appellants were allowed to call their co-defendants, Seth Caldwell, Jr., and Franklin A. Hall, because the plaintiff had called Elisha A. Packer, a defendant, to the stand. The Act of 1865 having permitted any party in any civil action or proceeding, whether at law or in equity, to compel an adverse party to testify, the legislature quickly saw that injustice might be done by allowing one co-plaintiff or co-defendant to be placed upon the stand without allowing his co-parties also to testify to contradict him, and passed the Act of 1867, to remedy this evil. The appellants, having availed themselves of their right, under the Act of 1867, to call their co-defendants, Hall and Caldwell, to the stand to testify generally, as well as to contradict Elisha A. Packer, are not in position now to object to the competency of the latter. They impliedly recognized his competency when they placed their co-defendants upon the stand. If we reject the testimony of Elisha A. Packer, that of Messrs. Hall and Caldwell stands upon no better footing.

We are of opinion, however, that Elisha A. Packer was a competent witness. He comes within the letter of the Act of 1865; and the fact that he was for some purposes the plaintiff's

agent, and presumably a friendly witness, has no bearing upon the case. Such an objection goes to his credit, not to his competency.

It was urged, however, that he was an incompetent witness under the Act of 1869, which swept away all objections to witnesses based upon "policy of law," but which contained a proviso that the Act should not apply to suits brought by or against executors and administrators. The answer to this is, that the witness would have been competent prior to the passage of that Act. It has been repeatedly held that the Act of 1869 was an enabling statute, and that it rendered no witness incompetent who was competent at the time of its passage: Sheetz *v.* Hanbest's Executors, 31 P. F. S. 102; Vidal's Appeal, 7 W. N. C. 159; Insurance Co. *v.* Shultz, 1 Norris 51; Pratt *v.* Patterson, 31 P. F. S. 117. It has always been the law of Pennsylvania, that a party to the record is a competent witness for the adverse party, if he is willing to testify. Even his mere declarations can be given in evidence against himself. Surely, then, his sworn testimony is equally competent if he is willing to give it. It was said by Justice ROGERS, in Solms *v.* McCulloch, 5 Barr 473, "The court rejected the witness on the well-settled principle, that a party to a suit, on principles of policy, can not be examined as a witness; but this is confined to cases where he is called to testify in favor of his own side, as if in this case General McCulloch (the witness) had been offered for his co-defendants; but it has never been supposed that the rule has been so unbending as to extend to a case like the present, where one of several co-defendants is offered as a witness by the plaintiff and is willing to testify. No question of policy interferes; there is no temptation to perjury where he is willing to give testimony in favor of his adversary and against himself. His declaration in and out of court would undoubtedly be evidence; and why should not his testimony on oath be received? There is no reason for the distinction; indeed, it is better for the co-defendants themselves that he should be examined in court, where, in case of misapprehension or conversation with the adverse party, he or they are likely to be affected. They would be more apt to succeed if a concert or combination existed by declarations out of than in court." See, also, Canon & Rooney *v.* Campbell, 6 Harris 169.

It was urged, however, that the Act of 1865 was never intended to apply to the case of a bill in equity, filed by one partner against his copartners for an account; that after a decree for an account, each of the partners becomes a plaintiff as against each of his copartners, for the reason that the settlement of the account involves three things; viz., 1. To ascertain how the firm stands in relation to creditors and other persons who

[Packer *v.* Noble.]

have had dealings with it; 2. To ascertain what each partner is entitled to charge against his copartner, and what credit he shall be allowed as against his copartners; and, 3. To apportion between the partners the profits and losses of the business. Hence it was argued, that while the nominal position of the parties to a partnership bill remains the same upon the record, yet in point of fact their real position is constantly changing, and the plaintiff of to-day may be the defendant of to-morrow. Conceding all this to be so, I am unable to see that it affects the case.

It did not require the aid of the Act of 1865 to render Elisha A. Packer a competent witness for the plaintiff. He might have been called if the Act of 1865 had never been passed, provided he were willing to testify. Under the Act of 1865 he could have been called nolens volens.

The construction claimed for the Act of 1865 is extremely refined, and we are asked to write an exception into the Act that is not to be found in the pamphlet laws. Aside from this we are unable to see any actual change in the position of Elisha A. Packer. At the time he was offered as a witness he occupied a position legally adverse to the plaintiff. The bill was filed by Asa Packer against six copartners, including the witness. The latter permitted the bill to be taken pro confesso against him; the remaining copartners resisted the bill. After the decree for an account, his interest in the account to be stated remained precisely as it was at the inception of the suit. If the amount claimed by the firm had been awarded to them, Elisha A. Packer would have been entitled to his share of it. Legally, his pecuniary interest was as much against the plaintiff after the decree for an account as before. We need not pursue this branch of the case further. We are of opinion that Elisha A. Packer was a competent witness.

Before I turn to the discussion of the facts, it is only proper to say that it is impracticable to refer to them in detail. It would extend this opinion beyond any reasonable length. All we can do is to consider some of the more important matters in as brief a manner as circumstances will permit. While the assignments of error are numerous, the seventh and eighth raise the pivotal questions in the case, over which the battle has been fought and upon which it must be decided. In considering these assignments, those that remain will be incidentally discussed.

The assignments referred to are as follows:—

7. The learned court erred in refusing to recognize the agreement (Exhibit F. A. D. 29) as a valid and operative contract, according to its terms, and so recognized by all the partners, including the plaintiff; whereas they should have held that,

[Packer *v.* Noble.]

in fact and in law, the contract evidenced by the said paper was an operative, valid, and binding contract according to its terms, and that the firm of Noble, Hammett & Co. were entitled to the several interests and profits and proportionate amounts of the stocks and loans therein mentioned.

8. The learned court erred in deciding that the defendants did not perform, or offer to perform, the contracts evidenced by Exhibit F. A. D. 29.

The paper referred to in the above assignments is as follows:—

"It is hereby agreed between Asa Packer, of Mauch Chunk, of the first part, and Noble, Hammett & Co., of Philadelphia, of the second part;

"That the said party of the first part will give to the party of the second part an interest in the Lehigh Valley Railroad equal to two-tenths ($\frac{2}{10}$) of the whole stock and loan of the said Lehigh Valley Railroad, and also two-tenths ($\frac{2}{10}$) of the net profits made by him, the said party of the first part, in the construction of said road, for which they, the said party of the second part, agree to furnish two-tenths of the whole amount of money required in the construction of the same; for which they the said party of the second part shall receive their proportionate amount of stock and loans, from time to time, as the work is done and the money paid by them, until it shall amount to two-tenths ($\frac{2}{10}$) of the whole.

"Philadelphia, February 1st 1853.          Asa Packer.
                                        "Noble, Hammett & Co."

Closely connected with this paper, and bearing the same date, is another paper called "the defeasance," and marked "Exhibit E," which may properly be introduced here. It is as follows:—

"For a valuable consideration I hereby agree that should Joseph Noble or Barnabas Hammett desire me to do so, between this day and the first of April next, I will transfer to them all my interest in the firm, property, and effects of Noble, Hammett & Co., they paying me any balance I have put into the said firm and my share of the profits; they making over to me all their right and interest in the property and effects of the firm of A. Packer & Co. upon my paying them the amount of Noble, Hammett & Co.'s accounts against said A. Packer & Co., and the share of profits which may be due them, and also all interest in the contract for building the Lehigh Valley Railroad, and release them from all obligations of their contract for the same; accounting to them for all sums they may have paid or become accountable for, with interest from the times of payments.

"Philadelphia, February 1st 1853.          "Asa Packer."

*o*

[Packer *v.* Noble.]

In order to properly understand these papers, and the questions of fact growing out of them, it is essential at this point to give a brief history of the case. I state what I understand to be the undisputed facts.

Asa Packer, the plaintiff in this cause, at and prior to the year 1850 resided at Mauch Chunk, Carbon county, in this state, and was engaged individually in selling coal in the city of Philadelphia. He sold coal for others on commission, bought and sold coal on his own account, and also sold coal mined by himself in conjunction with other parties. His place of business in Philadelphia was on Walnut street, between Fourth and Fifth streets, and his clerk and agent there was his cousin, Elisha A. Packer, one of the defendants. Three others of the defendants, viz., Joseph Noble, residing in Boston, Barnabas Hammett, residing in Philadelphia, and Franklin A. Hall, residing in Boston, were, under articles of copartnership, at the same time engaged in the coal and commission business. They had a house in Boston and one in Philadelphia. The Boston house was Noble & Co., and the Philadelphia house was styled Noble, Hammett & Co. The plaintiff sold coal to the Philadelphia house in 1849. On April 1st 1850, Joseph Noble, Asa Packer, and Barnabas Hammett formed a copartnership for the coal and commission business in Boston and Philadelphia. No change was made in the style of either the Boston or the Philadelphia house; the business of the former house was done in connection with Franklin A. Hall, one of the defendants. For several months after the formation of this new copartnership the plaintiff's individual office in Philadelphia was kept open in order to control its business in the interest of the new firm, after which his books were removed to the office of the firm of Noble, Hammett & Co., No. 20 Walnut street, where Elisha A. Packer continued to transact the plaintiff's private business and also assisted the firm as an employee. On or about the 1st of April 1852, the firm established a branch house at No. 11 Walnut street, Philadelphia, styled Asa Packer & Co. Its office was nearly opposite the place of business of the parent house, and the private books and papers of the plaintiff were transferred to the office of this branch house. The fact that the Boston and Philadelphia houses were connected with the branch house of Asa Packer & Co. was carefully concealed from the public. There do not appear to have been any written articles of agreement in regard to the new house, nor does it appear to have been furnished with any separate capital. Some money was furnished by the parent house from time to time, but not enough for its wants. The object of establishing this branch house would appear to be this: Noble, Hammett & Co. sold the coal mined by the Lehigh Coal and Navigation

[Packer *v.* Noble.]

Company. The company objected to the firm selling any white-ash coal but their own. The firm had other customers who mined white-ash coal, and, in order to retain their business and yet keep faith with the Lehigh Coal and Navigation Company, they established the firm of Asa Packer & Co. to handle all their white-ash coal other than that received from the Lehigh Company.

There is no evidence that either of the houses had any fixed capital. Each of the three senior partners appears to have had a considerable amount standing to his credit most of the time, and to have drawn out money at pleasure. The business was large and profitable; and the learned Master finds that, up to February 1st 1853, the gains of the firm amounted to $148,460.89, distributable as follows: $47,111.47 to each of the three senior partners, and $7,126.48 to Mr. Hall, the junior partner; and had the books been written up, there would have stood to the credit of the three senior partners, as capital and profits, the following sums, viz.: To Asa Packer, $90,828.23; to Joseph Noble, $89,408.13; and to Barnabas Hammett, $77,604.02.

It is proper to observe that, next to the Lehigh Coal and Navigation Company, the plaintiff was the largest shipper and consignor of coal to the firm of which he was a member; and the house of Asa Packer & Co. appears to have been his banker as well as his factor; while E. A. Packer, the manager of said house, was his agent for the transaction of his private business in Philadelphia.

During the year 1852, and the continuance of the partnership, Asa Packer opened negotiations with the parties controlling the Lehigh Valley Railroad Company, which at that time had neither capital nor credit. These negotiations resulted in a contract with said company, by which he agreed to build the road from Mauch Chunk to Easton, Pa., including a bridge over the Delaware river to Phillipsburg, N. J., for the sum of $2,500,000, of which $1,500,000 should be paid in the capital stock of the company, and $1,000,000 in its first mortgage bonds.

The road was estimated to cost about $1,600,000; and the bonds at eighty per cent., and the stock at fifty-three and one-third per cent. of their par value, would be the equivalent of the supposed cost.

It is also a fact, about which there is no dispute, that the plaintiff was desirous that his partners, particularly the senior members, should embark with him in this enterprise, and share with him the profits. With that view he offered them two-tenths of the stock and bonds which he was to receive from the company, as well as the same proportion of the net profits of

[Packer *v.* Noble.]

the enterprise, provided they would furnish two-tenths of the whole amount of money required for the construction of the road. The plaintiff was evidently sanguine of the success of the enterprise, and probably understood better than most men of that day the vast wealth of the Lehigh region, and its growing value for railroad purposes. I have no doubt, from the testimony, that Messrs. Hammett and Noble regarded the ultimate success of the road as at least probable ; but they feared, as conservative business men, to withdraw so large a share of the firm's capital from its legitimate business, and place it where it might be locked up for an indefinite period. Could they have foreseen the future, it is not likely this litigation would ever have arisen ; and we would not now be groping painfully and wearily through many thousands of pages of printed testimony to ascertain whether Messrs. Noble and Hammett accepted and acted upon the plaintiff's proposition.

It would appear that negotiations looking to some definite understanding continued for several months, and that about February 1st 1853, the three senior partners met, and Mr. Noble prepared two papers, which, it is to be presumed, expressed his own and perhaps Mr. Hammett's views or understanding of plaintiff's proposition for an interest in the road, or for a dissolution of the firm. The plaintiff evidently preferred they should join him in the enterprise ; failing that, he appears to have insisted upon either a dissolution of the firm, or a continuance in the firm, with the understanding that he should be allowed to draw out his capital as needed. One of these three things was absolutely necessary to enable him to prosecute his enterprise.

The papers referred to are those which I have given in full in connection with the seventh and eighth assignments of error. They involve the only serious contention in the case.

It is proper to state here, that on March 1st 1853, new articles of copartnership were entered into between the parties. The particulars thereof are not of especial significance in this case, and would not have been referred to here, but for the fact that about the same date, Noble, Hammett & Co. established another house (the fourth) in the city of New York, under the same style, viz., Noble, Hammett & Co. Were not this fact to appear, future references might be unintelligible. In order to show how the respective houses were managed and controlled, I give an extract from the Master's report. It is entirely accurate.

"While the articles made no distinction between the parties, as to their rights and powers, excepting as to participation in profits, this was not so according to the practice of the firm. The parent house was under the special management of

[Packer *v.* Noble.]

Mr. Hammett, assisted by Mr. Caldwell, who, prior to his admission as a partner, had been a clerk in the employ of the firm. The New York branch house was under the special management of Mr. Noble, assisted by his son, A. E. Noble, who had been an employee of the firm. The branch house of Asa Packer & Co., while nominally under the special management of the plaintiff and his cousin, E. A. Packer, who had also been an employee of the firm, and was the plaintiff's agent for his private business transacted in Philadelphia, was really under the management of E. A. Packer, as the plaintiff did not reside in Philadelphia but in Mauch Chunk, and it was not expected that he should, and he did not attend to any of the office business of the house, but to the mining and shipping of coal to be sold by the house on commission. And the house of Noble & Co., at Boston, was under the special management of Mr. Hall. The managers of these respective houses were not in the habit of examining, and were not expected to examine, the books of any house other than their own. They trusted for information, as to the condition of the other houses, to statements or trial balances which passed between them, usually monthly, nor did they inspect the correspondence of any house other than their own, nor did they sign the name of any house other than their own to business paper, excepting that Mr. Noble and Mr. Hammett could and did sign the name of the Boston house. It is doubtful whether the junior members of the parent house and the New York house could so sign the names of their respective houses unless specially authorized to do so; and it is quite clear that the members of the houses other than A. Packer & Co. were not considered entitled to sign the name of that house, or the members of that house to sign the names of the other houses. The reason for the establishment of this branch house, required that its business should be so conducted that none of the recognized members of the other houses should even appear to be connected with it; and so well was this connection concealed, that so far as is shown only a few persons dealing with the house, and to whom it was told, knew of it, and even the competent counsel of the firm and of the house, either was not aware of it, or considered the members of the other houses as secret partners; for in bringing suit for the house it would seem that he used the names of only the plaintiff and E. A. Packer, as partners constituting that house, as a firm. The relation of each of the partners other than the plaintiff to the firm, or to their respective houses, was simply that of a partner; but the relation of the plaintiff to the house of A. Packer & Co. was different and somewhat anomalous. He was not only a member of the firm, and held out to the business community as one of the only two members

[Packer *v.* Noble.]

of A. Packer & Co., not as a branch house but as an independent firm, but this house was his factor for the sale of coal mined, owned, controlled, and shipped by him to be sold on commission, and upon the establishment of the house it became, and thereafter, during the existence of the firm, continued to be his banker, through or by whom were conducted all or nearly all of his money transactions in Philadelphia."

The business of the firm, according to the partnership articles, was " the coal and commission business," yet it appears to have been interested in several other matters; and while it was stipulated that none of the partners should engage in any separate business unless the same should be agreed upon in writing, all of the senior partners treated this restriction as a dead-letter, and respectively engaged in important enterprises outside of their business. And a like disregard seems to have been paid by the senior partners to the clause in the articles prohibiting any member of the firm from using the money or credit of the firm for any purpose other than the business of the firm. The articles required that the books should be written up once a year, and the profits due each partner carried to his account with interest. This was not done and was the subject of frequent complaint on the part of the plaintiff, who, from first to last, insisted upon a settlement of the partnership books, and finally filed this bill for an account. It does not appear that any of the partners objected to writing up the books, except Mr. Hammett, who would not permit it to be done, lest, as he informed Mr. Caldwell, it might affect the firm's interest in the Lehigh Valley Railroad matter, and all the other partners acquiescing, except the plaintiff and E. A. Packer, it was never done during the continuance of the partnership.

It has been already stated that the house of Asa Packer & Co. was not only the plaintiff's banker, but also his factor for the sale of his coal. He was the largest shipper to this house, and with one exception the largest shipper to the firm. The business of this branch house during the years 1853, 1854, and 1855 averaged $800,000 ; that of the firm, $2,800,000. Of the business of Asa Packer & Co., the plaintiff furnished over $311,000 in 1853, over $518,000 in 1854, and over $440,000 in 1855, upon which he paid commissions for these years, respectively, of over $12,000, $18,000, and $22,000.

It will thus be seen that the plaintiff was a valuable customer of the firm of which he was a member. So long as he shipped coal to the parent house he was treated as other large miners and shippers had been treated; advances were made to him in anticipation of coal to be shipped, or he was allowed to draw against coal that had been shipped and in anticipation of the settlement of his accounts at the close of the season. After the

[Packer *v.* Noble.]

establishment of the branch house of Asa Packer & Co., his shipments were consigned to that house, and he appears to have been treated by it as he had been by the parent house. This course of dealing would at times make him appear to be largely the debtor of the house, for the reason that he drew upon it for coal shipped, or in anticipation of shipment, while the coal against which the drafts were drawn was not placed to his credit until the close of the season.

In addition to the money received for the plaintiff by the house as his factor from the sale of his coal, he was entitled to large credits for money collected by his house as his banker, on paper and securities of parties who were assisting him in the construction of the road, amounting from April 1st 1853, to March 1st 1856 to $872,295.73. The Master finds, and I think correctly, that during the years 1853 and 1854 the average state of the plaintiff's account shows that he was a creditor of the house, while in 1855 he became its debtor, and at the dissolution of the firm in 1856 he was indebted in the sum of $48,898.33. The Master further finds, that if the books of the firm had been written up as provided by the articles of copartnership, after making all proper allowances, omitting all disputed items, and charging against these partners their proper debits, and crediting them with their shares of only such profits and assets as they would appear to have been entitled to have placed to their credit prior to the dissolution of the firm, the state of their respective accounts would have been as follows :—

| | | | | | | |
|---|---|---|---|---|---|---|
| Feb. 1, 1853. | Balance to the credit of | | Mr. Noble, | . . | $89,408 | 13 |
| "    " | "    " | " | Mr. Hammett, | . | 77,604 | 02 |
| "    " | "    " | " | plaintiff, | . . . | 90,828 | 23 |
| March 1, 1854 | "    " | " | Mr. Noble, | . . | 159,266 | 45 |
| "    " | "    " | " | Mr. Hammett, | . | 118,393 | 81 |
| "    " . | "    " | " | plaintiff, | . . . | 86,987 | 43 |
| Feb. 1, 1855. | "    " | " | Mr. Noble, | . . | 197,169 | 17 |
| "    " | "    " | " | Mr. Hammett, | . | 151,275 | 31 |
| "    " | "    " | " | plaintiff, | . . . | 12,519 | 44 |
| March 1, 1856 | "    " | " | Mr. Noble, | . . | 176,954 | 07 |
| "    " | "    " | " | Mr. Hammett, | . | 179,237 | 60 |
| "    " . . | . " | " | debit of plaintiff, | . . . | 34,526 | 02 |

I will now return to the two papers to which reference has already been made, and around which the interest of this case centres.

It will be noticed that they bear even date, viz., February 1st 1853, and that one is signed by the plaintiff and the firm, and the other by the plaintiff. So far as the mere signatures go, both papers are perfected. They had evidently been written on the same sheet of letter paper, one of them on each half sheet, and the sheet then torn apart. The handwriting of both

papers is that of Joseph Noble, and the signatures are admittedly genuine. But there was no evidence as to when, or under what circumstances, they were signed. No witness was present when they were executed, at least no such witness was produced before the Master. In regard to the first paper, which is called the contract, the signature of Noble, Hammett & Co. was evidently made with a different ink, and from this and other circumstances it was argued for appellee that the signature of the firm was of a later date than that of Mr. Packer.

As to their custody, we have the testimony of Seth Caldwell, Jr., who says, as to the contract, " It remained for some time in the fire proof of Noble, Hammett & Co., Philadelphia. It was afterwards put in a tin box with other valuable papers of the firm, and put in one of the banks for safe keeping. It was afterwards taken to New York by Mr. Hammett with other valuable papers and documents. After the death of Joseph Noble I found it in his private fire-proof, amongst his valuable papers. Since then it has been in the custody of the executors of Joseph Noble, and we kept it for a time in a tin box in one of the banks for safe keeping. It was then taken to Boston and put in one of the vaults of the Union Safe Deposit Company, on State street. Since the taking of testimony before the Examiner in this case, soon after the 1st of February, it was brought to Philadelphia and put in one of the safes of the Fidelity Safe Deposit and Trust Company, N. B. Browne, president, situated on Chestnut street between Third and Fourth." And as to the other paper called the defeasance, the witness stated that it was found in Boston, among the papers of the executors of Joseph Noble.

So far as is known, no duplicate exists of these papers, or of either of them.

On the 10th of February, 1853, the firm gave the plaintiff an acceptance of his draft for $5,000. This was followed by other acceptances, which, with the sum of $8,750.10 charged against him for railroad chairs, amounted to $153,570.10, the whole of which was claimed by appellants to have been advances to aid the plaintiff in the construction of the road. They were charged to him on the books of the parent house, in continuation of the individual account of the plaintiff as it stood upon their books. There was nothing upon the books of the firm to connect the charges with the contract set up, nor with the building of the road. While the firm were making these advances the plaintiff delivered to them one hundred of the first mortgage bonds of the company for $1000 each, and a certificate for one thousand eight hundred shares of its capital stock. After May 25th 1855, no other acceptances were given by the firm, although they were frequently and earnestly pressed

by the plaintiff to give them. The plaintiff had become seriously embarrassed, and when the road was finished in October 1855, he had about $800,000 of floating debt. He still pressed the firm to have the books written up, evidently under the belief that notwithstanding the advances he had received they were indebted to him.

The house of Asa Packer & Co. also became embarrassed in its effort to sustain the plaintiff. The firm was appealed to for help, but it refused further aid either to the plaintiff or the house unless fully protected. Finally the firm advanced $10,000 or more after being secured by the bonds of the Lehigh Valley Railroad. It was believed at that time that the plaintiff and the house of Asa Packer & Co. were hopelessly involved, and to avoid responsibility for their liabilities, some of the other members of the firm denied all connection of the firm with this house. The plaintiff's paper was protested on December 8th 1855, and that of Asa Packer & Co. on December 12th 1855. On March 1st 1856, Mr. Noble, Mr. Hammett, and Mr. Caldwell published a *notice of the dissolution* of the firm, in which only the three senior partners were recognized. as members. This notice was published without the knowledge or consent of the plaintiff or E. A. Packer. Practically they were expelled from the firm. Thereupon Mr. Noble, Mr. Hammett, Mr. Hall, and Mr. Caldwell formed a new partnership under the name of Noble, Hammett & Caldwell, at Philadelphia and New York, and Noble, Hammett & Hall, at Boston, while the plaintiff and E. A. Packer, with others not connected with the old firm, formed a new partnership under the name of E. A. Packer & Co. After this the plaintiff filed this bill against his late copartners, including E. A. Packer. Subsequently a division was made, without prejudice, of certain admitted assets of the firm between the three senior partners. Among the assets thus distributed were the stock and bonds of the Lehigh Valley Railroad Company, before referred to. Upon this distribution the plaintiff received $63,235 ; Mr. Noble received $70,303.60, and Mr. Hammett received $66,683.50. The books of the firm were subsequently written up by Henry S. Godshall, Elisha P. Wilbur, and Seth Caldwell, Jr., under an agreement in writing, signed by all the parties in interest, and under the same agreement all other matters in dispute were adjusted, leaving open only the claim of the appellants under the alleged contract with the plaintiff, for building the Lehigh Valley Railroad.

The contention of the parties is so well stated by the learned Master, that I give it substantially in his language, somewhat condensed.

The appellants for the firm set up the paper " F. A. D. 29"

[Packer v. Noble.]

as a contract, and contend that it was duly executed by the plaintiff, and by Mr. Noble for the firm ; that the difference in the color of the ink is utterly unimportant, for even if the firm's name had not been subscribed to the contract it would be effective against the plaintiff, provided the firm accepted and acted upon it as a partnership transaction, which it is insisted they did.   Not upon it, however, in its literal sense or according to its strict terms, but in its sense, and according as varied or modified by the plaintiff's promise or representation, that not more than $100,000 should be taken out of the cash assets of the firm, and that the rest of the required money could be raised on the stock and bonds to which the firm would be entitled, which induced them to enter into the contract ; and in this sense they performed, and more than performed, their part of it by paying to the plaintiff directly $158,570 in acceptances and railroad chairs.   But even if the contract should not be so modified the firm should in equity be held to have performed their part of it, because the plaintiff, as a member of the firm, was just as much bound to perform it for the firm as any other member of the firm ; and to pay railroad contractors, and for railroad materials, the plaintiff and his agent, E. A. Packer, used the name, funds, and credit of the firm to a very large extent, and either out of the money thus used, the difference between the direct payments and the two-tenths of the cost of the railroad should be made up, or it should be made up by charging against him the balance which stood to his credit with A. Packer & Co., on February 1st 1853, and which he afterwards drew out, and his indebtedness to that house at the dissolution of the firm, and the interest he received on the bonds to which the firm were entitled under the contract, but which he unjustly withheld from them ; or, if it should be held that the firm cannot make up this difference in the one or the other of these two ways, they should be charged with it in the account here to be stated.   That the plaintiff recognized the existence and force of the said contract, and in pursuance and performance of it, delivered to the firm one hundred bonds of $1,000 each, and a certificate for one thousand eight hundred shares of the capital stock of the said railroad company, but in violation thereof he refused to deliver all of the bonds and stock to which the firm were entitled, and on April 15th 1876, he was indebted to the firm in sixty-two thousand and seventy-seven shares of the stock, or the highest market value thereof, and in addition thereto in either $1,130,904.71, or $1,085,744.76 in cash, as the firm shall be held to have performed the contract in the one way or the other of the two ways just mentioned.   And it is further contended that the use by the plaintiff, or his agent, of the firm's name, funds, and credit was surreptitious, and conse-

quently that the firm are entitled not only to two-tenths of the stocks, bonds, and profits under the said contract, but to the remaining eight-tenths of the stocks, bonds and profits received under the contract to construct the said railroad, with their accretions, and that the plaintiff was on this ground indebted to the firm on April 15th 1876, in one hundred and seven thousand one hundred and ninety-nine shares of stock, or the highest market value thereof, and in addition thereto either in $2,908,321.70 or $2,863,161.75 cash, as the firm shall be held to have performed the contract in one or the other of the two ways just mentioned. And as to the profits of the succeeding partnership, it is contended for such of the members of the firm as used the assets of the firm for the new partnership of Noble, Hammet & Caldwell, or Noble, Hammett & Hall, that they had a right to all the assets so used, and these assets were duly charged against their respective accounts.

On behalf of the plaintiff, it is contended as to the first issue that the claim of the firm is stale, and should not be entertained ; that the paper set up as a contract was not so set up until more than fourteen years after the dissolution of the firm, and was not during the life of the partnership deemed or considered a contract at all ; that it was simply an offer made by the plaintiff to Mr. Noble and Mr. Hammett, representing the firm, which he was anxious for them to accept, and endeavored to persuade them to accept, but which they declined to accept, because they feared that the money required to perform the firm's part thereof would embarrass the regular business of the firm ; that if the firm ever made this alleged contract a partnership transaction, he was not notified of it ; that the firm's name was not subscribed to it at its date, and whenever afterwards the name was so subscribed, it was not in his presence nor was he notified of it, nor did he know of it until it was produced before the master ; that it is not true that the plaintiff, as an inducement, promised or represented that not more than $100,000 should be withdrawn from the cash assets of the firm, and it is not pretended that such a promise or representation was omitted from the paper by fraud accident, or mistake ; that the firm did not furnish to him nor did he demand or receive the said railroad chairs or any of the acceptances under or in pursuance of such a contract, but that the said railroad chairs were regularly sold to him, and the acceptances were requested, furnished and received in pursuance of an understanding that if he would not dissolve the firm and withdraw his large business (which he had determined to do if he could not get help from his firm for his railroad contract), he should be allowed, for this purpose, to draw against his means in the firm. That the firm did not demand or receive, nor did

he deliver, the said one hundred bonds and eighteen hundred shares of stock under and in pursuance of any such contract, but they were delivered, requested, and received as security to protect the firm against any possible loss by his drawing against his means, and to be used by the firm as collateral, if needed. That he did not, nor did E. A. Packer for him, make any surreptitious use of the firm's name, funds, or credit, and that instead of his being indebted to the firm on April 15th 1856, as contended for by the defendants, the firm were indebted to him on that day in the sum of $1,268,337.09, on account of the said stock and bonds so delivered to them, and which they unjustly withheld from him. And as to the second issue, that after the dissolution of the firm the defendants, who used the means thereof, had no right to so use them until the firm's debts had been paid and the firm's accounts settled:

The learned Master found: First. In view then of all the proofs, the Master is of opinion, and so reports as a fact, that the paper F. A. D. 29 was not an operative contract, according to its terms, and was not during the existence of the partnership so considered by either the plaintiff, or to his knowledge by Mr. Noble or Mr. Hammett, as representing the firm; and,

Second. But if the Master had been required by the proofs to find, that such a contract had existed, he would have been obliged to report and does report as a fact, that while both of these parties, the plaintiff on one side and the firm on the other side, were during the partnership able to perform such a contract, and neither of them was excused by the act of the other from performing it, or offering to perform it, neither of them did perform it or offer to perform it, nor did either of them demand from the other the performance of it.

The remaining facts found by the master are all subsidiary, and enter into those above stated, and will not be noticed excepting as may be necessary in the discussion of the main questions.

Was the paper F. A. D. 29 a valid and subsisting contract recognized and acted upon by the parties?

The very truth of this transaction is now beyond the reach of any human tribunal. It lies buried in the graves which have opened since these proceedings commenced. We have for our guidance meagre accounts of what the parties said, what they wrote, and what they did. If these footprints mislead us, it is no fault of the law or of those who administer it.

There is no doubt that the firm aided the plaintiff to a large extent in the construction of the road. Indeed, it may well be doubted whether he could have performed his contract successfully without their assistance. I regard it as equally clear that

7 OUTERBRIDGE—14

this aid was furnished in pursuance of some·contract or understanding between the plaintiff and the firm. It was either money· paid to the plaintiff by the firm on the account of its quota towards the construction of the road, or it was money advanced or loaned to the plaintiff to be repaid with interest, as is usual between lender and borrower. The value and importance of this· paper (F. A. D. 29), should it be established as a valid subsisting contract, cannot well be overstated. Every line of it in such case would be worth a fortune. We therefore naturally turn to the record to see when and by whom this paper was first brought to the light and set up, not so much· as a defence to the plaintiff's claim, as the ground of an independent claim of ·a large amount which the appellants hold against the plaintiff.

Chronology is sometimes the best history. This bill was filed August 19th 1857, against Joseph Noble. and Barnabas Hammett,. setting forth this partnership, and praying for an account.

The plaintiff filed a supplemental bill on March 2d 1858, in which F. ·A. Hall, Elisha A. Packer, Seth Caldwell, Jr., and Augustus E. Noble, were brought in as defendants.

The answer of Joseph Noble was filed April 29th 1858, and it contains no reference to the paper in question ; on the contrary, it sets up an alleged oral contract, differing in many essential features from the writing. It is sufficient to say in regard to this oral contract that it is ,purely colloquial in its nature, and scarcely rises to the dignity of a contract. Standing alone, it amounts to but little, and contradicts the appellants' own case as set forth in the paper " F. A. D. 29." If intended as a qualification of the latter, there is neither allegation nor proof of ·such fraud, accident, or mistake as would render it admissible. The appellants must stand or fall by the paper F. A. D. 29..

The joint and several answer of Barnabas Hammett and Seth Caldwell, Jr., was filed December 5th 1859, and makes no reference to this paper. The several answers of Franklin A. Hall and Augustus E. Noble were filed December 5th 1859, and make no reference to· the contract.

It was not until the amended answer of Barnabas Hammett was filed, June 3d 1870, about five years after the death of Joseph Noble, and nearly thirteen years after the original bill was filed, that we hear of this paper. In his amended answer, Mr. Hammett set up this contract and annexed a copy. In the meantime Asa Packer had overcome his financial difficulties, and was a man of large fortune. His road commenced to pay dividends in 1858, and the value of its securities had greatly appreciated since that time. The claim of the appellants under

[Packer v. Noble.]

the contract was very large, and it was known to them that the plaintiff was pecuniarily able to meet it. Judging the appellants by the same rules which ordinarily influence human conduct, we would naturally expect they would be eager to set up and establish their demand. Yet so far as the pleadings show, and to the best of my recollection so far as the evidence shows, the first distinct demand made upon the plaintiff for two tenths of the stock, bonds, and profits of the Lehigh Valley Railroad under this contract was nearly thirteen years after the plaintiff had filed his bill. If this paper had been in force as a valid contract, it must have been known to all of the appellants; especially to Joseph Noble who wrote it, and they also knew its great importance. It seems incredible that they could have considered it in force, and yet have wholly omitted all reference to it in their answers for thirteen years. Yet it was possible, and so I pass on.

If the paper was signed by the plaintiff at the time it bears date, and left with Messrs. Noble and Hammett for their consideration and acceptance, it is very plain that a subsequent acceptance by them would not avail unless and until such acceptance was communicated to the plaintiff. There is no evidence that this was ever done. The correspondence shows that the paper was not in force at its date. The limits of this opinion will not permit more than a brief reference to this correspondence. In no part of it is there a distinct assertion of the existence of such a contract, unless it be in a single letter from Jos. Noble to the parent house. The Master finds, and he is correct, that " It is not directly mentioned in any of the very many letters which passed between the houses or members of the firm, nor is it referred to or even alluded to so as to identify it, in the correspondence with the house of A. Packer & Co., or in that between that house and the plaintiff, or in that between the plaintiff and E. A. Packer, or the members of any of the other houses, although it must be admitted that there were occasions, and not a few of them, during the construction of the road, when such a contract might very properly have been appealed to distinctly and emphatically."

It would not be difficult to select one or more letters from this voluminous correspondence that, standing alone, would seem to favor the contention of either side in this controversy. For instance, there is the letter of Joseph Noble to the parent house, dated December 22d 1854, which contains, inter alia, the following :—

" I think that the load is too much to carry, if we have to pay the full proportion in money for two-tenths of the road. It will be so much of capital as to embarrass business operations very much.

[Packer *v.* Noble.]

".I should think the judge would let Mr. Carter or some other parties take a part.

" Mr. E. A. P. says that the monthly payments are about 25,000 to 27,000 on the road. If so, the calls here will about keep the workmen along, and they will only have to provide for outstanding debts.

" I suppose we must pay our proportion on the road. Mr. E. A. P. says their house is indebted to the Judge. I told him I supposed he had most of the capital drawn out. I suppose he represents all the Lehigh coal rec'd by A. P. & Co. You had better look again and satisfy yourself as to this—have we our proportion of stock and bonds transferred to Noble, Hammett & Co. ?"

This is the only letter in all the correspondence which can be fairly said to contain a distinct admission of the contract, and an inquiry as to the firm's proportion of the bonds. It was not, however, addressed to the plaintiff, or to any one representing him, and as to him may be regarded as a private letter from one partner to another. It does not appear that it was intended for the plaintiff, or that he had knowledge of it. I have scrutinized every letter, every account, and every word of testimony (save as before stated that of the plaintiff), and I have failed to find any admission by any one of the appellants, at any time or at any place, made to the plaintiff, that the appellants, or either of them, were liable to the former for two-tenths of the cost of constructing this road, or which distinctly admits the existence of the alleged contract. It is not in the record. That E. A. Parker did not understand that the firm were committed to this enterprise appears reasonably certain from his letter of the same date, addressed to the New York house, but evidently intended for Mr. Noble, in which he says :—.

" We are unable to get an acceptance from Mr. Hammett to-day, as he says you have the matter in charge. He is perfectly willing that you should give them, but says he declines committing you in any way.

" We believe you make the same objection in regard to committing him, and between the desires on both sides not to commit each other, we are the sufferers. We have telegraphed Judge to come up and attend to the matter, and hope the whole business will be placed on such a footing that we may all know what we are about."

To which Mr. Noble on the next day, December 23d 1854, replied as follows:

" You misunderstood me. I said that the business was done at Phila., and the accounts kept there. When I was there I signed the drafts, and when Mr. Hammett was not at Philadel-

[*Packer v. Noble.*]

phia to attend to it I did it here, but would not have papers made here, and sent there for record when the proper party was there to do it.

"The best way is to see just how much has been drawn out of funds of the (firm) so there may be a perfect understanding."

On the next day, December 24th 1854, E. A. Packer replied to this letter and said, inter alia :—

"I herein send you a draft for $5,000, at 4 mos. from 20th inst., for acceptance. Mr. Hammett refused to accept, and he is going on to New York to-night. You can both decide on the matter. Mr. Hammett and myself had an unpleasant controversy yesterday, in which the Judge joined. Now we are both tired of such occurrences because we believe them wholly uncalled-for. Judge proposed to Mr. H. that there should be an immediate dissolution, at which he consented and promised to have you sent for, for the purpose of arranging the preliminaries. Whether he has done so I am unable to say.

"The Judge is fully determined to have our business placed on a different footing, for no one seems to understand them now. If it can't be arranged short of a dissolution, the sooner that is accomplished the better. I know such exhibitions are not in unison with your feelings any more than they are with ours, and fortunately our circumstances, no more than yours, require that we should submit to them. If you decline accepting the dft, please give us your reasons, and at same time tell us when you are ready to meet us, for we propose placing our matters in a different shape. It is needless for me to say to you the necessity for us to know at once our true position. They have been carried on too long in this uncertain, non-committal way, and your personal interest, as well as ours, requires an immediate change."

The answer of Mr. Noble, dated December 28th 1854, says not one word about accepting the draft, nor does he give any reasons for not doing so. He expresses a regret that there had been any hard feelings, suggests that the accounts should be made up so as to show how much had been drawn out for the road, and stating that he had no objection to a dissolution of the firm if it was considered best.

Even more significant is the previous letter of Barnabas Hammett to Joseph Noble. It is as follows:—

"*J. Noble, Esq.*,                          "Phila., Sept. 8th 1853.

"DR. SIR :—Yours of the 7th, dated the 6th, is now before me, instead of the telegraph which I requested if you wished me to accept the draft. In my note to you I stated that I should take it for granted you did not wish me to accept unless I got a telegraph from you. Yesterday morning, not receiving

the telegraph, I said to Elisha I had not heard from you. Suppose he wrote the Judge. Have not seen him this morning. Shall see him as soon as he comes to his office.

"I recollect very distinctly the evening you wrote the note to Judge Packer declining the stock, which note I approved of, as I left the whole control of it in your hands to decide ; as I was willing to take it or not to take it, just as suited you best. This was the position I took from the first, as you are aware. I have never urged or solicited you in any way in the decision, but left it wholly with you to decide ; giving you my opinion that I had not any doubt but it would be a first-rate paying stock, and that there could be a large amount of money made out of it provided we had means enough to go through with it. This is the only doubt I ever had or that I now have. I think when the road is finished it will be as good a paying stock as any we have in this country, and I will now leave it in your hands to do whatever you may think best. Let your decision be what it may, I shall be satisfied.

"Yours very respectfully,<br>"B. HAMMETT."

This correspondence, with much that preceded and followed it, is entirely inconsistent with the theory that the contract " F. A. D. 29 " was in force, as claimed by the appellants. The whole business would seem to have been uncertain. It will be noticed that the plaintiff does not claim that the appellants were in duty bound to accept the draft because of a contract to pay two-tenths of the cost of the road. Nor do the defendants decline to accept because they had advanced all they were legally called upon to do under the contract. Its existence is not asserted by either side to the other, and so far as it may be said to have been admitted by the appellants, it occurs only in letters which were evidently not intended for the plaintiff's eye, and which in point of fact were not seen by him.

It is undoubtedly true that the plaintiff was at all times, up to at least the dissolution of the firm, willing and desirous that the firm should accept the contract. This is plainly indicated by the testimony, particularly in the letters of E. A. Packer. Some of these letters were evidently written for the purpose of inducing the firm to commit themselves, and are to be construed in this light. This will account for what are seeming recognitions of the contract on his part. On the other hand, the firm appear to have been extremely cautious, and carefully avoided committing themselves to the plaintiff or to E. A. Packer, his agent. So that we have presented the singular spectacle of the plaintiff now repudiating a contract which he at one time not only urged the appellants to accept, but, through his agent, resorted to a species of finesse in order to obtain their admission.

of its binding force ; while the appellants are now claiming and vehemently attempting to establish a contract which they were exceedingly shy of when it was open to their acceptance. The changed circumstances may perhaps account for this anomaly. It is our duty to look at it in the light of the events as they occurred, and not of the circumstances as they existed years afterward, when the doubtful enterprise had become a great and assured success.

It is impossible for any one to read the testimony impartially and say at what particular point of time this paper became a contract binding upon the parties. But it is said the parties acted upon it ; that the firm made large advances of money to the plaintiff, and received from him a considerable amount of the bonds and stock of the road under the contract.

I concede the evidence shows that the firm advanced the money and received the bonds and stock, but that is all. It does not show that either was done under and in pursuance of the contract. On the contrary the weight of the evidence is the other way. In the absence of direct evidence of the contract, it was of course competent for appellants to show that the parties acted under it and treated it as binding. And if acceptance on the part of the plaintiff, and performance on the part of the appellants, were shown, it would be conclusive.

The advances of money are equally consistent with the plaintiff's theory, that they were made in pursuance of an understanding that in case appellants declined to accept the contract, they should allow him to draw against his interest in the firm. They had the choice of doing this or a dissolution. There is evidence to sustain this assertion. Moreover, the overwhelming probabilities of the case are in its favor. The enterprise which the plaintiff had undertaken was a gigantic one for that day. The estimated cost of the road was $1,530,853.50, and estimates of this character are seldom above the amount actually required. This was a sum many times greater than the plaintiff could possibly command of individual means.

We can understand, therefore, that if the firm declined either to accept the contract or to aid by advances, the dissolution of the firm was an absolute necessity to the plaintiff. We can understand, also, that it was important for the firm to retain the plaintiff as a member. The commissions on his individual business amounted in one year, as before stated, to $22,000. This was not an inconsiderable matter, and may well have induced the appellants to strain a point in the matter of advances rather than lose him as a partner and customer.

Were the advances of money made under the contract? The burden of proof upon this point is upon the appellants.

[Packer *v*. Noble.]

They set up the contract, a perfectly independent transaction, and in no sense responsive to the plaintiff's bill, and must prove it.

They attempt to do so in part by showing certain advances of money or credits made under it, and it is for them to connect such advances with the contract either by direct proof or such circumstances as amount to proof. In my judgment the proof is overwhelmingly the other way.

What duty did the contract impose upon the appellants? Clearly that of paying the plaintiff in cash two-tenths of the whole cost of the construction of the road. This would require the firm to withdraw from its cash assets over $300,000. This was a large amount at that day for even the firm of Noble, Hammett & Co., and it passes all belief that they would have done it or attempted to do it without any reference to the contract upon their books, or without opening an account against the road or the plaintiff, in which the transaction would clearly appear.

It is no sufficient answer to this to say it was a mere matter of book-keeping. The interests were too vast, and Messrs. Noble and Hammett at least were men of too much business experience for such a matter to have occurred from mere accident or the carelessness of a clerk. It was manifestly an intentional omission, and indicates to my mind very clearly that Messrs. Noble and Hammett had not at that time made up their minds whether they would hold the plaintiff under the contract, or only as a debtor of the firm for the money so advanced. An examination of their books shows that these advances were charged to the plaintiff precisely as they had been in the habit of doing prior to 1853, when he was merely a partner in the firm and a consignor of large amounts of coal to his own house.

There was nothing to distinguish the advances in 1853–'4–'5 before mentioned, amounting to $153,570.10, from those before made. Upon the books of the firm they appear as advances of the money and credit of the firm upon the personal and business credit of the plaintiff, with nothing to connect them, even by implication, with the contract. All of this large sum, excepting the single item of $8,750.10, was in the form of acceptances, whereas, had the items been payment on account of the contract, they should and probably would have been made in cash. The contract called for money, and the use of acceptances would necessarily compel the plaintiff to use and perhaps exhaust his bank credit to obtain the money. This would necessarily cripple him to that extent in getting money from other sources. Standing alone this is a matter which is not very important, but it is a circumstance entitled to

[Packer *v.* Noble.]

consideration when we endeavor to ascertain what the parties intended by what they did.

Then again the plaintiff was charged interest on these advances, and the whole went into his account showing his indebtedness to the firm on his business transactions. If they were payments under the contract, they were not the subject of an interest charge, nor had they any place in the plaintiff's coal account, nor in his account as a member of the firm. As between the plaintiff and the firm it was an independent transaction, as much so as if between the latter and a stranger. The advances as they appear upon the books of the firm show a loan to the plaintiff and nothing else, and this is equivalent to a declaration to that effect by the appellants as of that date. It was their construction of the transaction at the time it occurred.

In regard to the Lehigh Valley Railroad stock and bonds we are in no doubt whatever. Fortunately we have Asa Packer and Joseph Noble brought face to face upon that matter. It occurred in this way. On March 6th 1856, at the suggestion of Mr. Noble, certain entries were made in the books of the parent house, in which the plaintiff was credited with $190,000 of the stock and bonds, estimated to cost fifty cents on the dollar, being one hundred bonds of $1,000 each and eighteen hundred shares of stock=$95,000. Some time after these entries had been made a trial-balance was sent to the plaintiff in which the above items occurred. He immediately sent the following letter, dated April 24th, 1856, to the firm :—

" I notice by your trial-balance sent me yesterday that you have entered the stock and bonds of the Lehigh Valley Railroad Company at fifty per cent. of their par value.

" For fear that you may attribute my silence into an acquiescence in the entry, I have to say that I am not willing to put them in at any such price. I hold myself in readiness at any and all times to carry out the provisions of the contract existing between us in relation to the matter."

Subsequently, when the successors of the parent house sent this letter to the successors of the New York branch house with a request to return it, that house, by Mr. Noble, replied :—

" Yours of the 25th received, as also Mr. Packer's notice, which we return. That notice is all well enough. If the bonds and stock cost more we must of course allow more."

We have here the construction which the plaintiff and Joseph Noble placed upon this transaction, and there is no difference of opinion between them. They both agree in this, that the stock and bonds were to go into the account at cost or at a price to be agreed upon. This is absolutely conclusive that they were not given by the plaintiff under the contract

" F. A. D. 29," for if they had been there would have been no
question of cost or value in the case.    Under that paper the
appellants would have been entitled to two-tenths of the stock
and bonds, whether they cost much or little.    It would have
been sheer impertinence in the plaintiff to have written such a
letter had the contract been in force, and worse than stupidity
in Joseph Noble to have written as he did if the stock and bonds
had been received under the paper " F. A. D. 29."

The obvious meaning of all this is that the firm were to take
stock and bonds at a certain value in payment or as security for
the advances made to the plaintiff.    The contract referred to
in Mr. Packer's letter was probably in reference to this.    That
it could have been the contract set up by the appellants is out
of the question, in view of the allusion to the price of the
bonds.

Not only was there no reference to the contract on the
books of the firm, but the books of the plaintiff were equally
silent in regard to it.    This could hardly have been the case
had the contract been in force.    Accurate accounts of the cost
of the road as it progressed would have been necessary in order
to determine the appellants' quota of the expense.    Without
such statement the plaintiff would never have been in a posi-
tion to demand the large sums to which he would have been en-
titled under the contract.    And it is significant that, during all
the years that the work progressed, and during much of which
time the plaintiff was sorely pressed for money, there never was,
so far as the evidence shows, a demand by him upon the appel-
lants or any of them for payments due under the contract.
Even when his calls for aid were refused and his drafts re-
turned, he did not assert as he might and probably would have
done had the contract been in force, that the money he asked
for was due under it, and that he demanded it of right.    It is
not probable, hardly possible, that the plaintiff would not have
furnished accounts from time to time showing the progress of
the work and claiming from his partners their share of the
cost.    To assert the contrary is to argue against all the proba-
bilities and the usual course of dealing.

There is no presumption in favor of an improbable thing.
It requires proof.    Nor is there a particle of evidence that the
appellants ever refused to advance to the plaintiff upon the
ground that he was not entitled thereto under the contract.    It
is too much to ask us to believe that experienced, sagacious
business men like Joseph Noble and Barnabas Hammett would
go on advancing large sums of money under this contract,
without demanding from time to time distinct statements or ac-
counts of the cost of the construction of the road.    It is true
there were occasional vague inquiries as to its condition.    But

[Packer v. Noble.]

they were not such as would probably have occurred, had the appellants' advances been made under the contract, and are entirely consistent with the fact that they had become holders of the stock and bonds to a large amount, and had in addition claims against the plaintiff, the value of which might depend to some extent upon the success of the enterprise.

It is idle to attempt to decide a question of fact of this magnitude upon isolated and perhaps careless expressions in particular letters. We must look at the entire case; the position of the parties; their course of dealing during all these years, and the entries made in their books at the time the events occurred. I have no doubt from a careful examination of the testimony that both Joseph Noble and Barnabas Hammett were favorably inclined to this enterprise; but they were cautious. Mr. Hammett was timid and by nature undecided. They feared to bind themselves beyond recall for the large sum this contract called for. They saw, and I have no doubt with sagacious foresight, possible financial embarrassments in the withdrawal of so much active capital in an enterprise which, however alluring, was foreign to their business. This is a rock upon which thousands of business men have been hopelessly wrecked. And it is quite easy to see why they did not desire to lose the plaintiff as a partner and a customer. It may be that these considerations produced that halting, hesitating policy which appears to have marked the course of the appellants throughout. They advanced him money to an amount which was possibly intended to about cover his interest in the firm, and then made further advances upon collateral. All of this time the paper " F. A. D. 29 " was kept carefully in the background, and at no time or place did they notify the plaintiff that they had accepted it, regarded themselves bound by it, and intended to perform it. If the enterprise turned out well they could present the contract to the plaintiff and demand their proportion of stock and bonds; if it proved a disaster, they could confront him with their acceptances. This view is fully warranted by the evidence. Upon no other theory can the refusal of the firm to settle its accounts in the face of the plaintiff's earnest demands for such settlement be accounted for. Mr. Hammett would not permit it to be done, lest, as he informed Mr. Caldwell, it might affect the firm's interest in the Lehigh Valley Railroad matter. Affect it how? The answer is plain. A settlement of the accounts would have compelled the firm to show their hand. They must have claimed credits for payments made under the contract and thus have bound themselves irrevocably to its terms; or they must have ignored the contract and charged the plaintiff for the advances as money borrowed from the firm. A settlement of the accounts would

necessarily have compelled the firm to take the one position or the other, and this was obviously the reason why Mr. Hammett and the other members of the firm refused to settle.

It was urged, however, and the appellants placed much stress upon this part of the case, that the contract was fully performed on their part. This would be persuasive evidence of the existence of the contract if the fact were so. It remains to consider carefully this branch of the case.

The learned and able counsel for the appellants have presented this question in various aspects at different stages of the proceedings. I will consider the latest view of the matter as it appears in the appellants' paper-book. It is as follows :—

" If the construction of the railroad cost all the Master conjectures that it may have cost, to wit, $1,600,000, the proportion of the firm's contribution would have been $320,000. The amount of aid furnished directly by the firm was very much more than this, and amounted to at least $387,718.92, made up as follows :—

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Acceptances admitted, | . | . | . | . | . | . | . | $145,000 00 |
| Railroad chairs, . | . | . | . | . | . | . | . | 8,570 10 |
| Paid to contractors, | . | . | . | . | . | . | . | 173,569 38 |
| Cooper & Hewitt, for iron, | . | . | . | . | . | . | . | 48,679 44 |
| Hancock & Foley, for iron, | . | . | . | . | . | . | . | 11,900 00 |
| | | | | | | | | |
| Total means furnished by the firm, | . | . | . | . | | | | $387,718 92" |

Conceding the accuracy of these figures, they do not prove, nor do they even tend to prove, performance. They are ingeniously placed, and plausibly presented for the purpose of creating the impression that the firm of Noble, Hammett & Co. withdrew $387,718.92 from their cash capital, for the purpose of constructing their proportion of the Lehigh Valley Railroad, whereas the figures referred to represent temporary loans and advances made by the firm to the plaintiff, charged to his individual account, and repaid with interest, or payments made by A. Packer & Co. for the plaintiff out of his own money. The fallacy of the appellants' argument on this branch of the case consists in ignoring the difference between the payment of a debt and the loan of money. Under this contract, if it be in force, the two-tenths of the cost of the road became a debt due from the firm to the plaintiff, and payable when and as the work progressed. That debt could not be paid by lending the plaintiff money, or acceptances which were charged up against him, and subsequently repaid by cash or credits. The truth is, the firm have been repaid every dollar they loaned the plaintiff, and if the contention of the appellants succeeds they

will get several millions of dollars for which they have given no consideration whatever, and which would be a mere bonus for the loan of money at legal interest. No such contract as this has been proved or even alleged, and had it been both alleged and proved, it could not have been enforced either at law or in equity. I do not understand it to be asserted, and it certainly has not been proved, that Noble, Hammett & Co. actually withdrew $387,718.92 from their capital and invested it permanently in the construction of this road; yet such would have been the result if that amount had been paid to the plaintiff under this contract.

So much for the above figures in the aggregate. I will now consider them briefly in detail to show that what I have said is strictly accurate.

The first item of $145,000 is for acceptances, and the amount is not disputed. These were acceptances by the appellants of plaintiff's drafts during the years 1853-4-5, and were charged, as before stated, against his individual account on the books of the firm. The interest on the respective drafts was all charged up against him. But these advances, as the Master finds upon abundant evidence, were made almost wholly from the plaintiff's own money, which he had the right to draw out of the firm.

Thus, on the first day of March 1854, although, according to the account furnished to him by Mr. Hammett, the plaintiff appeared a debtor to the firm for $6,465.27, he was really a creditor for over $86,986.73, and would have so appeared had the books been written up according to the partnership articles, and in compliance with the repeated requests of the plaintiff. Up to December 16th of the same year, and after March 1st, the plaintiff drew out $86,070.10, and was therefore only drawing out his own share of the profits made by his firm for the three previous years. After December 16th he only drew out about $27,500, which constitutes the total amount received by him in excess of his proper credits with the firm. But even this sum was in no sense a payment on account of the contract. It was neither given nor received as such, nor was it so entered either on the books of the firm or of the plaintiff. It was a loan of money—nothing more—and has been repaid with interest.

Next in order is the item of $8,570.10, for railroad chairs. It is sufficient to say in regard to this charge, that it stands upon precisely the same footing as the acceptances. The railroad chairs were furnished to the plaintiff by the firm, and charged to the same account.

The item of $173,569.38 paid to contractors requires a brief explanation. As stated, it would seem to imply that the plain-

[Packer *v.* Noble.]

tiff had used $173,569.38 of the money of the firm to pay his contractors. It is made up of various sums paid the contractors by the house of A. Packer & Co. for the plaintiff. But, as before stated, this house was the plaintiff's banker in the city of Philadelphia, through whom the greater portion of his large business was transacted. He had the right, therefore, to draw against his own funds in this branch house at pleasure.

After he became engaged in this railroad enterprise, drafts to the amount of $173,569.38 were drawn in favor of contractors and paid by the house. But they were paid with his money, not the money of the firm. The master correctly finds that during the three years covered by these drafts he had shipped to the house of A. Packer & Co. coal amounting to $1,273,921.26, from which deducting for commissions, tolls, discounts and all other expenses, say fifty per cent. (a very full allowance), there would remain a balance of $636,960.63 to his credit with the house. Add to this balance the money received by the house for him, largely from parties who were aiding him in the enterprise, aggregating $872,295.73, and there is shown to have been held by the house on the two accounts $1,512,256.36 in cash, all of which was the plaintiff's own money, and against which he had a right to draw at pleasure. Not a dollar of the money used to pay these contractors belonged to the firm, and of course cannot be considered now upon the question of performance.

The item of $48,679.44, paid Cooper & Hewitt for railroad iron, is equally without merit. This iron was bought by E. A. Packer, on account of the plaintiff, but in the hurry of business he inadvertently used the name of the firm in signing some of his letters. This led to a misunderstanding as to the kind of paper to be given in payment; Cooper & Hewitt demanding the paper of A. Packer & Co., and E. A. Packer insisting that only the individual paper of the plaintiff should be given. The letter by which the negotiations for the purchase of the iron were begun and the one by which it was concluded were signed by the plaintiff individually, and E. A. Packer had, therefore, good grounds for his position. But the firm refused to deliver the iron upon the individual paper, for the reason, as they alleged, that they had made arrangements to use the paper of A. Packer & Co. The result was, the paper of the branch house was given for the iron, of which fact E. A. Packer advised the plaintiff and also Joseph Noble. The learned Master finds: So far as appears, none of the other members of the firm knew that this paper had been so given until after it began to mature, when the plaintiff and A. Packer & Co. being unable to meet it, the New York branch house, with the knowledge and consent of the parent house, helped

[Packer v. Noble.]

them to have some of it renewed, and to pay some of it. All of this paper, whether original or renewed, was secured by collaterals belonging to the plaintiff; the firm ran very little if any risk in respect to it; the renewed notes did not fall due until after the dissolution of the firm, and were ultimately paid by the plaintiff."

No argument is needed to show that the Cooper & Hewitt paper has nothing whatever to do with the appellant's performance of the contract.

The item of $11,900, paid Hancock & Foley for railroad iron, stands on no better footing. The notes were secured by the plaintiff's collateral and were paid by him.

If we concede, for the purpose of the argument, that the appellants have established the paper F. A. D. 29 as a valid and subsisting contract, yet upon the question of performance they have utterly failed. The only matter which has even the color of performance is the acceptances, amounting say to about $150,000, less than half the sum which it is admitted the contract would have required. I have no doubt this money, or at least the greater portion of it, was advanced to the plaintiff to aid him in the construction of the road, and was probably used for that purpose. But it was a loan of money which has been repaid, and was no more payment under the contract than if the firm had loaned him that amount upon the security of a mortgage. They fixed the character of this transaction by the entries upon their books. That which the parties failed to do in their lifetime, these mute witnesses do for them after their death; and while the ingenuity of able counsel may for a time give a certain degree of plausibility to a different view of the matter, it will not bear the test of reflection and examination. It stands upon no better footing than the payments by A. Packer & Co. of plaintiff's contractors with his own money, or the payment by himself, or at least by his own means, of the notes of Cooper & Hewitt and Hancock & Foley for railroad iron. But for the zeal with which this branch of the case was pressed upon our attention we would not have thought it necessary to occupy so much time in its discussion.

The further point was taken, that even if the firm had not performed the contract, the plaintiff himself, as a member of the firm, and for the firm, was bound to do so, and that he can not now set up his own failure to perform as an answer to the appellants' claim.

This point has the merit of ingenuity and little else. It has not been made clear to us that it was the plaintiff's duty to perform both sides of the contract; nor has the mode been pointed out how he was to do it. It is manifest he could only have done so by using the assets of the firm against the consent

of the other partners.    The general rule undoubtedly is that it is as much the duty of one member of the firm to perform the contract of the firm as it is that of the other members.

But this contract was between the plaintiff and his firm. His own interests were in the line of its performance, and the evidence justifies me in saying he would have been very glad to have had it performed.    But was it his duty to perform it against the wishes of his partners?    There may be many instances, even in contracts between a firm and strangers, where it may be the interest of one partner to perform, while that of the others lies in a contrary direction.    It is the duty of a partner to consult the interests of the firm rather than his individual advantage.    Besides, how was the plaintiff to perform this contract against the will of his copartners?    How was he to reach the assets of Noble, Hammett & Co., and apply them to the building of this road, against their will?    It probably never occurred to the mind of Joseph Noble or Barnabas Hammett that the plaintiff could take the assets of the firm, which were practically under their control, and use them to perform this contract ; and there is little doubt that any such attempt would have been resisted at the outset.    The thing is in its nature unreasonable, if not impossible.    While equity will in some instances enforce a contract specifically, I have never known a case in which it has held one party to perform both sides.    This position is wholly untenable.

But, say the appellants, if the firm did not perform this contract, they may perform it now, in the account to be here stated.

This proposition, stripped of the coloring in which it is presented, amounts to this : It is true we have not paid the plaintiff our quota of two-tenths of the cost of the road ; we feared at the time that the withdrawal of so much of our capital might seriously embarrass us ; we were doubtful also of the success of the enterprise ; that doubt is now removed ; the road is finished and profitable ; we are now willing that the amount we should have paid may be charged up against our share of the profits.

We need not discuss such a proposition as this at length. The very statement of it would shock a chancellor's sense of justice.    It is true as a general proposition that in equity time is not of the essence of a contract, but this principle is never carried so far as to work injustice.    It aids no man to reap where he has not sown.    Time is always of the essence of a contract, even in equity, where delay operates as an injury, or where the nature and necessity of the contract required it to be so construed.    Story on Contracts, section 970.    It was said in Hollingsworth *v.* Fry, 4 Dallas 345, that " The great rule of interpretation with respect to deeds and contracts is to put such

[Packer *v.* Noble.]

a construction upon them as will effectuate the intention of the parties, if such intention be consistent with the principles of law. In the present case there is no difficulty in coming at the intention, as it is clearly and forcibly expressed in the agreement, and is capable of receiving one construction only. The time of payment is made a substantial and not a mere formal circumstance; it enters into the essence of the contract and therefore must be observed. The court can not decree against the legal and express stipulation of the parties themselves. The situation of the parties, the nature of the property, and the speculative spirit of the project, were powerful inducements for drawing up the agreement in the plainest and strongest terms, so as to leave no doubt as to the intention and to render the time of performance a cardinal point. Again, if the agreement would admit of another construction, the complainant, under the circumstances of the case, comes too late to avail himself of it. The door of equity can not remain open for ever. The complainant did not make a tender of the money till a lapse of five years after the termination of the time limited by the contract. So far was he from using legal diligence that he has been guilty of gross delay. In cases of the present kind, equity will not suffer a party to lie by till the event of the experiment shall enable him to make his election with certainty of profit one way and without loss any way. This mode of procedure is unfair, contrary to natural justice, and in exclusion of mutuality."

This was equity then and it is equity now. Had the language of the court been intended for this case it could not have fitted it more accurately. The object of this contract was to furnish the plaintiff with money to construct the Lehigh Valley Railroad, not to sell its stock and bonds at fifty cents on the dollar after they had acquired a market value in excess of par. Unless the money were furnished at the time it was needed, that is during the progress of the work, it was of little use to the plaintiff. To permit the appellants to perform this contract at this late day by the mere settlement of an account, would be to give them an enormous sum of money for which they gave nothing and for which they assumed no risk. The offer to perform comes too late. " The door of equity can not remain open forever," nor will equity suffer " a party to lie by till the event of the experiment shall enable him to make his election with certainty of profit one way and without loss any way." There is a bead-roll of authorities in England and in this country sustaining this principle. It is sufficient to refer to Groves *v.* Donaldson, 3 Harris 128; Bellas *v.* Hays, 5 S. & R. 427: Reilly *v.* Walsh, 11 Irish Equity 22; Hart *v.* Clarke, 19 Beav. 349; Prendergast *v.* Turton, 5 Jurist 1102; and 8 Jurist 205;

Smith *v.* Clay, 3 Brown's Chancery Reports 640; Wagner *v.* Baird, 7 Howard 234 ; Ashhurst's Appeal, 10 P. F. S. 290.

We are of opinion that the learned Master has correctly found that the alleged contract F. A. D. 29 was never in force as a valid subsisting contract; and that even if in force, recognized and acted upon by the parties, it has never been performed by the appellants, who were at all times able to perform it, and who have never been excused from such performance.

The appellants contend, however, that if they cannot recover two tenths of the stock and bonds under the contract, yet they are entitled to all the bonds, stocks, and profits received by the plaintiff by reason of his surreptitious use of the firm's name, funds, and credit to aid him in the construction of the road. This claim rests upon the familiar principle that when a partner surreptitiously uses the means of his firm, or their credit, in or about his own business, the firm may claim either the profits or products of the money so used, or the money itself with interest. Such use of money is prohibited by the fundamental law of partnership, and the same principle runs through most of the trust relations. The true reason of it is that the earnings or profits which money produces belong in equity to the owner of the money and not to him who may happen to be its custodian.

I do not understand that it is contended that the plaintiff, or any one for him, used surreptitiously either the name, funds, or credit of either Noble, Hammett & Co., or Noble & Co., but the allegation is that the plaintiff, or E. A. Packer for him, and as his agent, made such use of the name, funds, and credit of the branch house of Asa Packer & Co. That the plaintiff was very largely assisted by that house, has already been stated, and is a conceded fact in the cause. The extent of this assistance, and the question whether it was done in such a clandestine manner as to bring the plaintiff within the well-settled rule above stated, will be next considered. The Master has found, and the evidence shows that it was known to at least some if not all of the partners, that the plaintiff was so assisted. It was known to the managers of the parent house and the New York branch house, and they made no objection. The firm was amply protected by the plaintiff's collaterals, and they probably regarded the risk as slight.

The learned Master finds: "It was known too that much, if not nearly all, of the plaintiff's business requiring to be done in New York, and which was done through the agency of E. A. Packer, was, either through the force of habit of correspondence, or to save time and trouble, or because the plaintiff's money passed through the bank accounts of the house, done by or in the name of the branch house. Mr. Noble, in writing, whether

[Packer v. Noble.]

about the business of A. Packer & Co. or of the plaintiff, would nearly always address his letters to the branch house, and E. A. Packer in writing to the New York branch house, whether about the business of A. Packer & Co. or of the plaintiff, would nearly always sign his letters with the name of his branch house. So far as concerned the form of the dealing between these two houses, A. Packer and A. Packer & Co. were treated as convertible terms. Mr. Noble therefore knew about all the business of the plaintiff thus transacted through the branch houses of Noble, Hammett & Co., New York, and A. Packer & Co. ; and the correspondence between the New York house and the parent house shows that the parent house must have known that the plaintiff's business was so transacted.

" This business consisted of the collection of drafts or other business paper given to the plaintiff by parties, known as the New Jersey Central Railroad parties, in payment of purchases by them of about $500,000 of the stock and bonds of the Lehigh Valley Railroad Company, and of the negotiation of certain time paper of A. Packer & Co. with Eastern banks. As to the former sort of business the name of the house was used chiefly to endorse the paper for collection, which might just as well have been collected on the endorsement of the plaintiff, either by himself or by E. A. Packer, who held a power of attorney from him, but for his own convenience, without any instructions from the plaintiff, and, so far as appears, without his knowledge at the time, or because the cash collected was to be deposited with the cash of the house, and thus pass through plaintiff's accounts with the house, or because some of it had become the property of the house in its accounts with the plaintiff, E. A. Packer chose to endorse it with the name of the house, and in that name to collect it. . . . And as to the negotiation with the Eastern banks of time paper in the name of the house, it is sufficient to say that all of this paper, excepting two notes endorsed (but not so far as appears by either the plaintiff or E. A. Packer) in the name of Noble, Hammett & Co., was accompanied with the plaintiff's collaterals, and it is shown that the plaintiff did not authorize the issuing of it, and that Mr. Noble knew of it, some or all of it, and did not object to it, and the firm were not called upon to pay, and did not pay any of it."

It is entirely clear that there was no concealed use of the name of the firm in these two classes of paper. It was contended, however, that there was such use of it otherwise to aid in the construction of the road in other instances, viz :—

1. In raising money on temporary loans made prior to the dissolution of the firm, and which were entered only on the books of the house.

2. In raising money on temporary loans made prior to the dissolution of the firm, and which were entered only on his private books.

3. In raising money on temporary loans made after the dissolution of the firm, whether entered on the books of the house or his private books.

4. In raising money on time paper of the house, issued prior to the dissolution of the firm, and entered only on his private books.

5. In raising money on time paper of the house, issued after the dissolution of the firm, and entered only on his private books.

The learned Master has explained at considerable length and with much clearness the system of book-keeping of the house of A. Packer & Co., under which all these transactions occurred. The limits of this opinion will not permit me to go into detail or to quote at any length the finding of the Master. It was not perhaps the best system that could have been devised; but there does not appear to have been either fraud or concealment intended by it, nor does the plaintiff appear to have been cognizant of it. Upon this point the Master finds "E. A. Packer or Mr. Godshall adopted this system of book-keeping immediately after the establishment of this branch house, months before, so far as appears, the plaintiff undertook the building of the road, and adopted it not by the direction or even suggestion of the plaintiff, or with his knowledge, but at their own suggestion and for their own convenience, and without any purpose of concealment." The system of book-keeping to which the Master refers evidently grew out of the peculiar relation of the plaintiff to this firm, of which he was a member, and which was at the same time, as I have before stated, his banker and factor. The plaintiff's business and that of the house were by the manager and book-keeper, of their own motion, mingled together. If money was wanted for the day, it was borrowed almost always on the plaintiff's collaterals, and used indiscriminately for the plaintiff and the firm. The resulting balance each day was entered on the books of the firm, which were kept by the same book-keeper, and were laid side by side on the same table. With this brief explanation I will consider the class of loans first above mentioned.

The aggregate of these loans amounted to about $780,000, nearly the whole of which were made prior to the dissolution of the firm. The amount seems large, but when the fact is stated that the highest amount outstanding at any one time was $37,567.78, and that the average amount outstanding was $10,000, the matter assumes a less formidable aspect. As the strength of a chain is its weakest link, so the extent of the lia-

[Packer *v.* Noble.]

bility of the firm for this paper was the highest amount out-standing at any one time. The sums borrowed were usually on very short time, for a day, or a few days, and almost invariably made upon collaterals and without issuing any paper.

The collaterals were nearly all those of the plaintiff. The proceeds were used indiscriminately for the house and for the plaintiff. But a single loan appears upon the books as ear-marked for the plaintiff's use, and this was secured by a deposit of bonds of the Philadelphia and Trenton Railroad Company belonging to the plaintiff. The only witnesses who were called to this transaction were E. A. Packer and Mr. Godshall, and neither of them was able to state how much of the money raised upon the paper or collaterals of the house was used by the plaintiff; but I have no doubt whatever from a careful ex-amination of the testimony of these two witnesses that more money was used by the house which was raised upon the plain-tiff's collaterals, than was used by the plaintiff of the money raised upon the name or collaterals of the house. Nor will it do to infer that all the money actually used by the plaintiff was used for this railroad. His dealings with the house were large upon other accounts, and as the largest shipper of coal to the house, he had been allowed by the parent house to draw against his shipments of coal in anticipation of settlement, and this course of dealing was continued by the branch house after it was established. It is also to be remembered that the money raised by the house upon the collaterals of the plaintiff was the money of the plaintiff, and did not cease to be so because E. A. Packer for his own convenience chose to deposit it with the cash of the house instead of to the credit of the plaintiff. The system of book-keeping, as before observed, may not have been the best, but it was the system used by the house prior to this railroad enterprise, and there is nothing to connect the plaintiff with it. The appellants were not harmed by it, and as there is nothing to show an intent to conceal it from the other members of the firm it lacks the essential element which would require a court of equity to interpose for the relief of the appellants.

The second branch of the inquiry relates to the temporary loans made prior to the dissolution of the firm, and which were entered only on the plaintiff's books. These loans aggregate $41,000, and it clearly appears that the collaterals for all except $10,300 belonged to the plaintiff. The testimony fails to show whose collaterals were used for the $10,300, though the Master finds that the probabilities were all in favor of their belonging to the plaintiff. If this money was used in the construction of the road the burden is still upon the appellants to show that the money was raised upon the credit of the house. This has

not been done, and we cannot guess at it.  " If," as the Master says, " these loans were made without the use of the name or credit of the house, and with the plaintiff's collaterals, then, although the money was deposited with the general cash of the house, it was his money, and the account of it, and of the loans, was kept where only properly it could be kept, in his private books, and the plaintiff would be chargeable neither with concealment of the use of the name, funds, or credit of the house, nor with the use itself."

The temporary loans aggregate $1,222,296.07, of which sum the Master finds $22,400 were made between March 1st and 31st 1856, and were entered on the books of the house, while the remainder, which were made between March 31st 1856 and June 25th 1858, were on the plaintiff's private books.  The $22,400 stand upon the same footing as the other temporary loans already referred to.  If the name or collaterals of the house were used in making them it has not been shown.  The balance of these loans, amounting to $1,199,936.07, was made by the firm of E. A. Packer & Co., which, as before stated, was formed shortly after the firm of Noble, Hammett & Co. had been dissolved, of which firm only the plaintiff and E. A. Packer of the old firm were members.  So that, therefore, so far as the name and credit of any firm was used to make these loans, it was the name and credit of E. A. Packer & Co., of which firm none of the appellants was a member.  Upon this paper the appellants never were responsible, and they have not even the shadow of a cause of complaint in regard to it.

The fourth branch of our inquiry refers to the time paper of the house, issued before the dissolution of the firm, and entered only on the plaintiffs' private books.

The Master finds the amount of these loans to be $284,099.45.  Just here I will say that in discussing the question of loans I have adopted the Master's figures as to amounts without verifying their accuracy.  I have no doubt, however, that they are substantially correct, from his general care as to matters in which I have verified his findings.  Aside from this, an error in the amount of any of these loans would be of little importance here.  I am discussing principles, not amounts.  To resume.  The Master finds that all of this paper was issued by E. A. Packer, excepting one piece of $4,500, made by Mr. Godshall, and the drafts in favor of Hancock & Foley, which were made by the plaintiff himself, and all of it, excepting $21,309.77, was accompanied with the plaintiff's collaterals.  Mr. Godshall explains why.  He says that " it was impossible to negotiate the notes without the collaterals."  So that in point of fact the money was obtained upon the credit of plaintiff's collaterals, and not upon the credit of the house.  Just here it

is proper to say that I am unable to see in this connection what the credit of the firm of Noble, Hammett & Co. had to do with the raising of these and other temporary loans. Upon the street and in financial circles the connection of that firm with its branch house of A. Packer & Co. was unknown. The fact of that connection, as before stated, was carefully concealed from the general public, and known only to a few persons, as in the case of Cooper & Hewitt, to whom it became necessary to disclose it. The only persons known as composing the branch house were Asa Packer, the plaintiff, and E. A. Packer. The latter was not a capitalist, the former was known and reputed as a man of means and engaged in conducting a large business. The house of A. Packer & Co., so far as the evidence shows, was never supplied with any considerable portion of capital by the firm. Yet it did a business of $800,000 per annum. It would appear to have been sustained and carried along in great measure by the plaintiff, and his collaterals were freely used in raising money for its use. I am fully justified, therefore, in saying that the credit of A. Packer & Co. was simply the credit of Asa Packer. When money was borrowed by that house upon its paper, it was not, in point of fact, upon the credit of Joseph Noble, of Barnabas Hammett, or either of these appellants, for they were not known to be connected with it. Nor was it borrowed to any extent upon the credit of E. A. Packer, for his credit must have been limited. So that these temporary loans, whether made for the benefit of the house or of the plaintiff, were obtained really upon the credit of the plaintiff or his collaterals. All the firm could justly complain of was their liability upon this paper, and as they made haste to repudiate that, and deny their connection with the house of A. Packer & Co., upon the first sound of the tempest, a chancellor might perhaps be justified in taking them at their word, and holding that their cause of complaint in this respect was more imaginary than real.

Of this paper, $80,744.28 (including renewals), was the paper of Cooper & Hewitt, which has been before referred to. The firm knew of its issue, and did not complain of it. It also includes the Hancock & Foley paper, $11,900, and two notes of $5,000 each, endorsed by Noble, Hammett & Co., and the $45,000 discounted by the Eastern banks. The above amounts are all of this class of paper that can be traced to railroad purposes, and with the exception of the two notes of $5,000 were secured by plaintiff's collaterals; and all of these loans were subsequently paid by him, excepting, as the Master finds, a portion of the Cooper & Hewitt notes, which were settled for with plaintiff's coal, sold them by A. Packer & Co., and charged to the plaintiff's account. The firm knew, at least the New

York branch house knew, of the Cooper & Hewitt transaction, and the discounts by the Eastern banks, and made no objection. It is too late now to object that it was done surreptitiously, and as they did not pay any of this paper, they have not been injured. The Hancock & Foley paper has been sufficiently referred to elsewhere; the two notes of $5,000 each were made and accepted by the plaintiff himself in the name of the house. The Master finds, however, that " he was, so far as appears, a creditor of the house and of the firm, when it was given, and if he became a debtor of the house for a small amount before it fell due, he was still a creditor of the firm, and the defendants ought not in equity to object to it, as they not only refused to permit the plaintiff to know the state of his account with the firm, but Mr. Noble was permitted to overdraw his account to an amount exceeding, and Mr. Hammett to overdraw his account to an amount but little short of, the sum total of these drafts."

The aggregate of this paper, $284,099.45, was, like the other classes of paper, composed in great part of renewals. The largest amount outstanding at any one time was $69,900.51.

. The charge of concealment was strongly pressed as to this class of paper, and it arose chiefly from the fact that it was entered upon the plaintiff's books and not on the books of A. Packer & Co. There is nothing in the case to show that the plaintiff had knowledge of this fact, and there is negative evidence to show that he had not. The entries were made by Mr. Godshall and he testified " that he was confident that neither the plaintiff nor E. A. Packer ever instructed him to enter it only in the plaintiff's books, but that he made the entries from his own idea of keeping the accounts separate ;" and E. A. Packer testified that he presumed the reason why such paper, in the name of the house, was not entered in the books of the house, was that the collaterals belonged to the plaintiff, and the greater portion of it was being used for his private account. And both of these witnesses, Mr. Godshall indirectly ,(he was not interrogated directly), and E. A. Packer directly, disclaim any intention of concealment in entering, or permitting to be so entered, this paper only in the plaintiff's private books. While I cannot pause to refer to the testimony of these witnesses in detail, it is only proper to say that they fully sustain the finding of the learned Master above quoted. And I entirely agree with the conclusion of the Master, supported as it is by an exhaustive argument, that, " In this condition of the proofs the master can find no warrant in equity to support the contention of the defendants."

The fifth and last branch of this inquiry relates to the time

.paper of the house, issued after the dissolution of the firm, and entered only in the plaintiff's private books.

The whole amount issued was $827,323.06. It was evidently made up almost entirely of renewals of the paper of the house issued prior to the dissolution, though why it was renewed in the name of A. Packer & Co. by the new house of E. A. Packer & Co. is not clear. The witness E. A. Packer explains it by saying, that "he supposed that only the plaintiff and himself were interested in it, and that it made no difference particularly which we issued, whether the plaintiff's or the firm's." In this he was probably correct as a matter of fact. The appellants were unknown as partners in the house of A. Packer & Co., and as to strangers dealing with the house of A. Packer & Co. no notice of the dissolution was necessary. After the dissolution of the firm, as is well settled, its name cannot be used to bind the firm, except for the purposes of liquidation. Of the persons holding this paper, Cooper & Hewitt are, I believe, the only ones who knew of the connection between the houses of Noble, Hammett & Co., and A. Packer & Co., and Cooper & Hewitt could not at any time have recovered of the firm, for the reason that they were aware from the beginning that the railroad iron, which was the consideration of the notes, was bought by the plaintiff individually. Aside from all this, it is in evidence that the firm very well knew that the paper of A. Packer & Co. had been issued from time to time to aid the plaintiff, and they made no objection thereto. They might naturally expect that a portion of it would be renewed after the dissolution, as the holders would have the right, if they chose to insist upon it, to have either the same paper in renewal or payment. And when we consider the further fact that all of this paper was amply secured by plaintiff's collaterals, excepting the trifling sum of $8,351.27, which was secured by business paper made by Cooper & Hewitt, but to whom it belonged it does not appear, this part of appellants' contention does not seem very important. I can not better close this branch of the case than by giving the following passage from the Master's report : "The fact is, that after the dissolution of the firm, the members of these respective houses would seem to have considered themselves entitled to use the names of their respective houses, in appropriating to themselves the assets held by their houses for their individual benefit, and all of them did so use the name, and appropriate to themselves so much of the assets as they pleased or needed ; and so far as appears no objection was made to it. All of the defendants did it, and were permitted to do it, and with what equity can they complain or ask that the plaintiff shall be held responsible under the rule invoked, because he or his agent for him appropriated the name

[Packer *v.* Noble.]

or credit of his house in carrying through and completing after the dissolution of the firm a transaction begun prior to the dissolution of the firm, of which they were advised—to which they did not object—against which they were protected by his collaterals, and for which it is doubtful whether at any time they were liable, and which did not take one dollar in cash from the firm's assets? Equity endeavors to do the very right in the circumstances, and the Master is of opinion that this contention is not well founded."

Under any circumstances, as I have before intimated, the liability of the plaintiff for the paper of the firm alleged to have been used by him surreptitiously would be confined to the largest amount outstanding at any one time. The contrary view was however strongly pressed upon the argument. The best illustration of the appellants' position upon this question is to be found in the printed argument of Mr. Hirst before the Master. At the risk of being tedious, I quote it here: " Take, for instance, a drygoods firm on Market street, composed of three partners, one being the financial manager, with entire control over the firm's means, with authority to sign checks, draw and endorse notes, and so on. Suppose he purchases an invoice of goods for $20,000, issues the firm paper for it without the knowledge of his partners, sells the invoice, realizes $10,000 profits, and pays the note. That single instance renders him liable to pay the firm the sum of $10,000 profit derived from the use of the firm paper. If in the course of a partnership running two or three years he repeats the same transaction twenty or thirty or forty times, and takes up the firm paper in each instance before it matures, and during all the time his copartners are unaware of the practice by which he provides himself with the means to make his profits, could it be argued, that as he never used at any one time a sum in excess of $20,000 of the firm paper, that he is only to be charged with the profit on one sum of $20,000 ? "

This proposition is cleverly stated, and no fault is found with its law. The fallacy of it is that the facts are assumed. I can best answer it by giving it in another form, and which is in harmony with the evidence. Suppose the first note of $20,000, instead of having been paid at maturity had been renewed forty times, there would then have been but one transaction and $800,000 of paper to represent it. Could the firm complain in such case that its name had been used to the extent of $800,000, and that it had been made liable for this large sum ? It is not necessary to elaborate so plain a matter. Yet this is substantially the case before us. The plaintiff was engaged in the one transaction, the construction of the Lehigh Valley Railroad, and the paper referred to went into that. A

large proportion of the paper was but the renewal of other paper, and did not increase the liability of the firm. To the extent of the paper, if any, surreptitiously used and outstanding at any one time, the plaintiff would be liable, if liable at all. Tested by this principle the amount of this paper, compared with the cost of the road, was inconsiderable, and the claim of the appellants to the whole of the stock, bonds, and profits of the road can not be maintained. Nor do we regard it as good for any part thereof. The allegation that the plaintiff used the money and credit of the firm surreptitiously is not made out. As before stated, all that was done was through and by the branch house of A. Packer & Co. The burden of showing that it was done surreptitiously is upon the appellants. The firm knew of some of the paper and made no objection. The money raised was nearly all obtained upon the credit of plaintiff's collaterals, and much of it without the use of the paper of the house of A. Packer & Co. The paper was not needed to strengthen the collaterals, and the proceeds were used indiscriminately for the benefit of the house and the plaintiff. The circumstances do not point to that secret use of the firm's credit which is necessary to charge the plaintiff and make him liable to the appellants. It has been fully explained why it was done and by whom it was done, and that explanation fails to connect the plaintiff with it, much less to show that it was done at his instigation, or that it was intended to be concealed from his partners. Much of the confusion of this branch of the case, as before observed, is due to the relation of A. Packer & Co. to the plaintiff, as his banker and factor, and the system of book-keeping adopted. In the latter the appellants are as much responsible as is the plaintiff.

In the examination which I have been able to give this case, I have not discovered any serious errors in the Master's findings of fact. He is sustained throughout by the testimony. The testimony of Elisha A. Packer was much criticised upon the argument, but the Master has credited him, and we cannot do otherwise. There is nothing upon the face of the record which would justify an appellate court in treating his testimony as unreliable.

My own view of this remarkable case, somewhat foreshadowed by what has already been said, is this : The paper "F. A. D. 29" was evidently prepared by Joseph Noble in an informal way, and handed to Asa Packer for his approval. It was written on a half sheet of letter paper, and the "defeasance" was written on the other half of the same sheet, which was then torn apart. My theory is that Judge Packer signed the papers and gave them back to Mr. Noble for the consideration of the firm and their signature, when and if satisfied there-

[Packer *v.* Noble.]

with. When that signature was attached cannot now be known. But the signing by the firm was a secret transaction, and was never communicated to Judge Packer. It was not intended he should know it. There is no evidence of the existence of a duplicate of the paper, and there probably was none. Joseph Noble and Barnabas Hammett were in great doubt as to what they should do, yet they well knew they must do something. Judge Packer's necessities required the use of all his means, and they were compelled either to embark with him in the enterprise, or to furnish him in some way with an amount of money which would be at least the equivalent of his capital in the firm. But they doubted and hesitated which course to pursue. They were of opinion that the railroad would be a success if it could be carried through, but they feared failure and financial embarrassment. This doubt and hesitation continued after the papers were signed by the firm, conceding them to have been so signed before the dissolution. It was this hesitation, this want of decision, and possibly a difference of opinion between Mr. Noble and Mr. Hammett, which prevented their notifying Judge Packer of their acceptance of the contract. That notice once given could not be re-called, and their liability under the contract would become fixed. This was not their purpose; they designed leaving the whole matter open until the last moment. The paper was quietly laid aside, and was never afterwards referred to in the correspondence between Judge Packer and the firm. They commenced making him advances, for they knew they must do this or sever all relations with him, and continued to do so until they had given him what they probably regarded as his interest in the firm. This involved no risk, and they received interest for the money. Then they stopped and declined to go further without security. This was furnished, and the bonds and stock of the railroad company were given them for that purpose. The object of this mode of proceeding is palpable. It was to avail themselves of the benefit of the contract if the enterprise was successful, and yet not to commit themselves to it in case it proved a failure. Whether intentional or otherwise, the books were kept in such manner as to studiously ignore the contract. No reference to it appears upon them anywhere. The advances were charged against Judge Packer precisely as they had always been, and interest added as before. The end came at last, and Judge Packer and the branch house of A. Packer & Co. went to protest. The firm believed them to be hopelessly embarrassed, and made haste to cut loose from them. They denied their connection with A. Packer & Co., and expelled Judge Packer from the firm. If, as the firm expected, Judge Packer and his road had succumbed under his financial difficulties, I

[Packer v. Noble.]

am of opinion this contract would never have seen the light of day. The firm would have claimed and received its money with interest, and the whole matter would have been adjusted, as the books show the transaction to have been, a mere ordinary one between debtor and creditor, an advance of money to aid Judge Packer in his construction of his road. But the latter did not succumb, his road became a marked success, and years afterwards, when results had made it clear that it was greatly to their interest to claim under the contract, we first hear of this paper.

Even then Joseph Noble, who drew it, had it in his possession, and doubtless knew more about it than any one else, did not set it up in his answer. Yet he well knew its value had it been in force. He did not refer to it, much less say that it was in force, and I believe would never have done so had he lived. It was perhaps natural for Barnabas Hammett, years after Joseph Noble's death, and probably knowing less about it, to set it up in his answer. But it came too late to move the conscience of a chancellor. The firm had too much confidence in the enterprise or too little, and they made the mistake of halting between two roads until one of them had become impassable. The result does them no injury. They get back all their money with interest. Notwithstanding the advances, Judge Packer was nearly all of the time a creditor of the firm, and the settlement of the partnership accounts as found by the Master leaves him a creditor partner still. This will be understood when it is stated that, after charging against the plaintiff all of the acceptances and railroad chairs with interest, and all other sums which the firm can with any reason claim to have paid for him, and after receiving $63,235 from the firm in 1860, upon the division of the firm assets, the Master has found, and the court below decreed, that the plaintiff is a creditor of the estate of Barnabas Hammett, deceased, in the sum of $22,117.64, and of Elisha A. Packer in the sum of $3,891.33, and of Franklin A. Hall in the sum of $6,250.11. The firm has not a dollar invested in the road, and we can see nothing to justify us in disturbing the decree of the court below.

Nor will we disturb it upon the question of costs. The Master was right in deciding that the litigation was practically between the three senior partners. He therefore divided the costs between them. The junior partners do not and can not complain of this, and the representatives of Joseph Noble and Barnabas Hammett have no cause of complaint. But for their claim, which I have endeavored to show was unfounded, the litigation would not necessarily have been protracted beyond that of an ordinary partnership bill. The enormous expenses

attending it may be very properly laid chiefly at their doors. It is a matter of mercy to them therefore to let the decree stand as to costs.

I am aware, notwithstanding the unusual length of this opinion, that I have but touched many important matters, and others have not been noticed at all. The field is so vast that to bring the discussion within reasonable bounds was no easy matter. The ground has been gone over so thoroughly and so ably, not only by the court below and the Master, but in the arguments, oral and printed, of the distinguished counsel who represent the parties, that any omissions of my own may well be excused. ·

That I may not be absolutely right in all I have said is quite possible; that I have endeavored to be right to the best of my ability is certain, and there my responsibility ends.

The decree is affirmed and the appeals dismissed at the costs of the respective appellants.